Abdul Hakim Jamal Nasir **SHABAZZ**, a/k/a Owen X. Denson, Plaintiff,

v.

**K.C. BARNAUSKAS, D.S. Gladis, C.W. Blivens, D.H. Brierton, Defendants.**

Abdul Hakim Jamal Nasir **SHABAZZ**, a/k/a Owen X. Denson, Plaintiff,

v.

**R.G. WILLIAMS, F.I. Cowart, Defendants.**

Nos. 79–1–Civ–J–B, 79–38–Civ–J–B.

United States District Court, M.D. Florida, Jacksonville Division.

Jan. 11, 1985.

Abdul Hakim Jamal Nasir Shabazz, pro se.

Jason Vail, Asst. Atty. Gen., Department of Legal Affairs, Tallahassee, Fla., for defendants.

## OPINION

SUSAN H. BLACK, District Judge.

### History

Plaintiff, an inmate of the Florida penal system proceeding *pro se*, filed a civil rights complaint under 42 U.S.C. § 1983 on January 2, 1979, against K.C. Barnauskas, D.S. Gladis, C.W. Blivens, and D.H. Brierton. Plaintiff alleges that the defendants violated his eighth amendment right to be free from cruel and unusual punishment by forcing him to shave his facial hairs with razors and by writing numerous disciplinary reports against him for his failure to shave with razors despite his alleged permanent nonshaving permit for his alleged skin disease known as pseudofolliculitis barbae[1]. Further, he alleges that they violated his first amendment right to freely practice his religion since it is a tenet of his Islamic faith to clip his mustache and let his beard flow. Then, on January 12, 1979, plaintiff filed a civil rights complaint under 42 U.S.C. § 1983 against R.G. Williams, F.I. Cowart, and W.H. Gillard.[2] Plaintiff alleges that the defendants violated his eighth amendment right to be free from cruel and unusual punishment by initiating and processing a disciplinary report against

him for his refusal to shave his facial hairs with razors despite his alleged nonshaving medical permit for his alleged skin disease[3]. Further, plaintiff alleges that they also violated his first amendment right since it is a tenet of his Islamic faith to clip his mustache and let his beard flow.

On January 25, 1979, in *Shabazz v. Barnauskas*, Case No. 79–1–Civ–J–C (M.D.Fla. January 25, 1979), *vacated*, 598 F.2d 345 (5th Cir.1979), this Court dismissed plaintiff's first amendment claim on the basis of *Brooks v. Wainwright*, 428 F.2d 652 (5th Cir.1970), and dismissed plaintiff's eighth amendment claim on the ground that it was merely a supplement to the facts alleged in *Shabazz v. Williams*, Case No. 79–38–Civ–J–C. The Fifth Circuit held that the district court "should not have dismissed plaintiff's First Amendment claim without a hearing inquiring into plaintiff's alleged sincerely held religious beliefs and into the state's justifications for its regulations." 598 F.2d at 347. In sum, the Fifth Circuit vacated the district court's dismissal, remanded the cause for further proceedings, and directed that it be consolidated with Case No. 79–38–Civ–J–C. Accordingly, on July 31, 1979, this Court ordered that Case No. 79–1–Civ–J–C be reopened and consolidated with Case No. 79–38–Civ–J–C.

Plaintiff's first amendment claims were tried before the Court without a jury on November 13, 14, and 15, 1984. The Court denied the defendants' oral motion for directed verdict with regard to the first amendment claims and took the issue under advisement. Therefore, this opinion will address plaintiff's first amendment claims against defendants K.C. Barnaus-

---

1. These eighth amendment claims were tried by a jury on November 13, 14, and 15, 1984. The Court granted the defendants' oral motion for directed verdict with regard to defendant D.H. Brierton. The jury returned a verdict in favor of C.W. Blivens, D.S. Gladis, and K.C. Barnauskas. Accordingly, judgment was entered in favor of the defendants.

2. The Court dismissed W.H. Gillard finding that he died on March 24, 1983.

3. These eighth amendment claims were tried by a jury on November 13, 14, and 15, 1984. The Court granted the defendants' oral motion for directed verdict with regard to R.G. Williams and F.I. Cowart. Accordingly, judgment was entered in favor of the defendants. The Court dismissed W.H. Gillard finding that he died on March 24, 1983.

kas, D.S. Gladis, C.W. Blivens, D.H. Brierton, R.G. Williams, and F.I. Cowart.

## FINDINGS OF FACT

Having considered the exhibits and the testimony at trial, having heard the arguments of counsel for defendants and plaintiff proceeding *pro se*, and having observed the demeanor of the witnesses, the Court makes the following findings of fact:

1. Plaintiff, Abdul Hakim Jamal Nasir Shabazz, is incarcerated at Florida State Prison in Starke, Florida.

2. He is presently clean shaven.

3. Prior to his incarceration, he accepted the principles of the Islamic faith and lived by the tenets of the Islamic faith.

4. He is presently a sincere believer in the Islamic faith.

5. The growing of a beard is not an absolute tenet of the Islamic faith. Believers are told to emulate the Prophet Muhammad who wore a beard and kept it neat and clean. Muhammad preached to others to keep their beards neat and clean. (Testimony of Jack Harris.) Although the practice of growing a beard is discretionary, in fact the acting Imam (Islamic minister) Jack Harris, does not wear a beard, it is a practice that is deeply rooted in the religious tradition of plaintiff's faith.

6. Florida State Prison is a maximum security institution. In fact, it is the most secure institution in the state of Florida.

It houses individuals with severe sentences.[4] It also houses individuals who have demonstrated an inability to conform to prison life or who are high escape risks. (Testimony of Don S. Gladish.)

7. Because of its interest in maintaining security, Florida State Prison requires all inmates to be clean shaven[5] unless they possess a valid nonshaving permit for a medical condition. The clean-shaven policy facilitates the identification of escaped inmates. (Testimony of D.H. Brierton.)

8. The probability of recapturing an escapee lessens significantly as time goes by, thereby making early identification and recapture critical. (Testimony of D.H. Brierton.) An inmate who escapes with a beard can alter his appearance in a very short period of time by merely shaving, thus making it very difficult for law enforcement officials to identify and recapture him.[6] However, since it takes a long period of time to grow a beard, an escapee cannot thwart recapture by rapidly lengthening his hair.[7]

9. The Court specifically finds that the requirement that the plaintiff be clean shaven is due to the state's interest in maintaining security.

## CONCLUSIONS OF LAW

Here, plaintiff's first amendment claims raise three issues: (a) whether the practice of wearing a beard is deeply rooted in the religious beliefs of the Islamic faith; (b)

---

**4.** Florida State Prison is the only one in the state of Florida that houses death row inmates. Presently, there are approximately 218 death row inmates. Towers containing guards with weapons surround the prison. The inmates do not have access to the outside unless they are out on the yard for recreational activity or on the grounds for work detail.

**5.** According to Department of Corrections Policy and Procedure Directive 4.07.04:

Male inmates will be allowed to select their hairstyles within the following guidelines: hair, including sideburns, will be clean and combed, cut short to medium length and neatly trimmed at all times with no part of the ear or collar covered. Sideburns shall not extend beyond the bottom of the earlobes and will have straight lines with no flare at the base.

The face will be clean shaven. Each institution is encouraged to provide photographs or drawings of acceptable hairstyles.
Defendants' Exhibit 2.

**6.** To further facilitate identification, the Department of Corrections Policy and Procedure Directive 4.03.10 requires that an inmate's photograph be updated every five years, or at anytime an inmate undergoes cosmetic surgery or incurs a facial injury which alters his appearance in any way. *See* Defendants' Exhibit 3.

**7.** Although not a part of the argument at trial, the Court notes that, in the sparsely populated area surrounding Florida State Prison, it would be more difficult for an escapee to obtain another form of disguise rapidly than it would be for him to shave his beard.

whether plaintiff is sincere in his religious beliefs; and (c) whether the state regulation on facial hair can be justified under the constitutional standard. The defendants stipulated to the facts that the practice of growing a beard is deeply rooted in the religious beliefs of the Islamic faith and that the plaintiff's belief in Islam is sincere. Therefore, at issue is whether the prison policy on facial hair can be justified under the constitutional standard of review.

The Court is aware that at least two circuits have adopted a "least restrictive means" standard of review for evaluating religious freedom challenges to prison short hair regulations and have held that such regulations violate the first amendment's guarantee of freedom of religion. In *Gallahan v. Hollyfield,* 670 F.2d 1345 (4th Cir.1982), the Court of Appeals for the Fourth Circuit held that a prison haircut regulation was unconstitutional because it restricted an inmate's right to exercise freely his sincere religious beliefs when less drastic alternatives were available. Similarly, in *Teterud v. Burns,* 522 F.2d 357 (8th Cir.1975), the Court of Appeals for the Eighth Circuit affirmed the District Court's holding that justification for an absolute prohibition against wearing long hair was either without substance or overly broad. The lower court found that inmates who changed their appearance by growing long hair could be rephotographed for easy identification.

In this circuit, however, the standard of review to apply to religious freedom challenges to prison regulations is less clear. In a recent case challenging a prison regulation restricting the right of inmates to marry, the appellate court enunciated a standard composed of two parts:

First, the prison regulation must further a substantial governmental interest. A regulation will be taken to further such an interest if it is rationally related to it. Second, a regulation's restriction ... must be no greater than necessary to protect the governmental interest involved.

*Bradbury v. Wainwright,* 718 F.2d 1538, 1543 (11th Cir.1983).

It is not clear that this establishes a least restrictive means standard of review for prison regulations in this circuit. Furthermore, this Court is informed of the more recent Eleventh Circuit decision in which the Court of Appeals declined to adopt a "least restrictive means" standard of review for this circuit. *Furquan v. Georgia State Board of Offender Rehabilitation,* 727 F.2d 1115 (11th Cir.1984). In *Furquan,* the Court of Appeals reviewed a Georgia prison hair and beard regulation which was justified by Georgia prison officials as rationally related to the legitimate state interest in facilitating identification of escaped inmates. In upholding the regulation, the appellate court ruled that it need not decide "whether the 'least restrictive means' test must be employed in this type of first amendment challenge, for under either standard the regulations attacked here are sound."

Similarly, this Court recently reviewed a Florida prison hair regulation that plaintiff claimed was violative of his first amendment right to practice his American Indian religion which required long, braided hair. *Griffin v. Dugger,* Case No. 79–758–Civ–J–B (M.D.Fla. September 25, 1984). In *Griffin,* the Magistrate entered a Report and Recommendation and found that Griffin is an American Indian, that it is a religious belief of the American Indians not to cut their hair, that Griffin was and still is sincere in his religious belief and that the prison regulation requiring short hair is reasonably related to legitimate penological objectives such as discipline, health and sanitation, and security and therefore does not unconstitutionally violate plaintiff's first amendment right. *Griffin v. Dugger,* Case No. 79–758–Civ–J–B (U.S. Magistrate Report and Recommendation, July 14, 1983) (Attached as Appendix 1). Upon plaintiff's objection to the Magistrate's Report and Recommendation, this Court conducted a *de novo* review of Griffin's claim and affirmed the Magistrate's findings of fact. Then, the Court found that, under

either the rational basis standard or the least restrictive means standard, the prison haircut policy is not an unconstitutional violation of plaintiff's first amendment right because the fact that the regulation facilitates the identification of escaped inmates is a sufficient reason, in and of itself, to sustain the regulation. *Griffin v. Dugger*, Case No. 79–758–Civ–J–B (M.D. Fla. September 25, 1984) (Order attached as Appendix 2).

The evidence in this case is that the no-beard rule is for the same purpose and that it has facilitated prompt recapture of escapees in the past. This Court concludes that the prison shaving regulation, to the extent that it prohibits this plaintiff at a maximum security prison from growing a beard in conformity with his religious beliefs, is not violative of the first amendment. Judgment will, therefore, be entered for the defendants in accordance with these findings of fact and conclusions of law.

## APPENDIX 1

### UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF FLORIDA

### JACKSONVILLE DIVISION

F. STARR GRIFFIN, Plaintiff,

vs.

RICHARD L. DUGGER,[1] Defendant.

No. 79–758–Civ–J–B

### REPORT AND RECOMMENDATION

#### Introduction

Plaintiff, an inmate of the Florida penal system proceeding *pro se*, initiated this action by filing a civil rights complaint pursuant to 42 U.S.C. § 1983, on August 27, 1979. Plaintiff alleged that his freedom of religion was being wrongfully circumscribed by defendant's policy requiring shorn hair for all inmates. Plaintiff stated that he was a member of the Blackfoot Nation tribe and that tribal members have

a religious belief requiring long, braided hair. Plaintiff noted that death row inmates had long hair and beards. Plaintiff stated that long hair would not constitute a hazard to the institution and requested an injunction against enforcement of the policy as to him. On October 13, 1982, an evidentiary hearing was held before the undersigned at Florida State Prison.

#### Testimony and Evidence

Plaintiff's first witness was Redman Saxson Morris, an inmate incarcerated at Avon Park Correctional Institution. Mr. Morris testified that he was a Native American familiar with Indian culture and its significance. Mr. Morris stated that the tradition of long hair was handed down from Black Elk, and that it has been a very integral part of native religion. He testified that to cut the hair is to cut part of one's self. Cutting the hair would create a mental problem, removing a Native American's culture, pride, and dignity. It might also lead to a shortening of the life. An Indian believing in long hair, who is forced to cut his hair, hurts himself. Everything on earth is related religiously, especially long hair.

Noting that all of his family members wore long hair, Mr. Morris stated that some tribes do allow the removal of hair, depending on tribal custom. This is permitted by Medicine Men only in some tribes; some tribes mutilate themselves upon the death of a close relative and they shave their heads.

Mr. Morris testified that there were other important tenets of the Native American belief, such as use of the sweat lodge, participation in pipe circles, and the right to wear such religious ornaments as headbands and a red and blue bandana, which represents the red and blue holy days. Mr. Morris testified that anything "Indian" seemed to be offensive to prison officials despite the fact that Catholic, Protestant,

---

**1.** Richard L. Dugger should be substituted for David Brierton as he is the current Superintend-

ent at Florida State Prison. Rule 25, F.R.Cv.P.

and Muslim inmates are allowed to wear their medallions.

Upon questioning by the Court, Mr. Morris attributed the origins of his beliefs to the Native American religion, handed down from generation to generation as far back as faith recorded it. Mr. Morris referred again to such practices as wearing long hair, using a sweat lodge, and participating in the sacred pipe circle. Mr. Morris likened the pipe ritual to the passing of the Host in certain religions, and the use of drums to the use of an organ, sending a message to the Great Spirit. Mr. Morris testified that the use of sweat lodges cleanses the body to help purify the mind before proceeding to the pipe circle. He testified that he believes in the Great Spirit who created heaven, earth and all things; Mr. Morris furthermore noted that he lives his religion 24 hours a day.

Mr. Morris summarized the five main tenets, on cross-examination, as being long hair, sweat lodges, sacred pipe, religious ornaments, and red and blue bandanas. He testified that there were no other major practices and that the sweat lodge was the most integral part of the religion. When asked whether a sweat lodge could replace the necessity for long hair, Mr. Morris responded in the negative. When asked where long hair ranked among the tenets, he stated that each tenet ranked equally with the others.

Also on cross-examination, Mr. Morris testified that he had been a practicing American Indian almost all his life. He went to Catholic services for a while to observe and compare, but did not practice Catholicism. He did not know of any Indians who practiced a religion other than the Indian religion. Moreover, he testified that Indians who become Protestant or Catholic are called "apples," that is, "red" outside and "white" inside. He accepted the fact that being Indian is a heritage as well as a religion. His parents practiced the Native American religion, and he has no other living relatives.

Plaintiff's next witness was James Five Coat, an inmate incarcerated at Florida State Prison. Mr. Five Coat stated that he had Indian blood and had some knowledge regarding the Indian culture. Mr. Five Coat testified that long hair is a part of the religious beliefs, an essential element. Long hair is natural and places one in harmony with the earth. It is a natural belief, to conform with nature, and cutting one's hair removes one from harmony with nature. Life on earth is short, and when an Indian dies, it is essential to be in harmony with the earth or he will wander forever. He stated that he wants hair for his future life, and that hair is essential.

Personally, Mr. Five Coat testified that he had a case pending regarding the length of his hair. When he first arrived in the Department of Corrections, he was forced to get a haircut. Although he explained that he did not believe in haircuts, the prison officers did not care, and the grievances he has filed have been to no avail. Instead, he has been told that there are no exceptions to the haircutting policy, due to a problem with security.

When his hair was cut, Mr. Five Coat testified, it caused him mental concern. He did not understand why it must be cut, stating that such an action was similar to taking a Bible away from a Catholic. His cultural dignity was removed by the haircut, although they could not remove his pride in himself. Nonetheless, the cutting of the hair hinders rehabilitation. Unless a person lives his religion, he does not really have it. Wearing long hair is part of his family tradition, although not all of his relatives share that belief.

Mr. Five Coat testified that he was somewhat familiar with the sweat lodge, a purification act employed so that one could come clean in body and soul to spiritual activities. The pipe is used for sacred communication with spirits. Where he is from, the drum is not used much, although it is significant for harmony and lifts the mind up to get into the proper mood and harmony.

On cross-examination, Mr. Five Coat stated that he is Native American by birth, due to the fact that his father was an Indian.

He was baptized in a Native American church composed of American Indian Christians. He stated that the Indian religion believes Christ is a vessel to God, but is not worshipped; Christ is not a part of the mainstream Indian religion. The traditional church has different beliefs, but Mr. Five Coat belongs to a more modern church composed of persons who consider themselves Christian. He has gone to nondenominational church services. He was listed in prison records as Protestant, although he noted on redirect examination that he had asked for a change to Native American, and that he had never changed his religion.

When asked what Indian practices he observes in prison, Mr. Five Coat stated that he had a rattle, which had been smashed, and that he had been refused permission to wear his headband; according to him, prison officials do not allow many Indian practices. Long hair, the pipe, sweat lodges, and the drum are major practices, although everyone has his own beliefs and practices. Not every Indian must have the same beliefs in order to have the same religion. Mr. Five Coat testified, however, that he did not know any Indians who believe in short hair. Rather, it is only the ceremonies that may vary. There is no way to rank the various practices, and Mr. Five Coat did not believe the sweat lodge could replace long hair.

Mr. Five Coat was allowed to retain his long hair while in the military service. When Mr. Five Coat entered the Department of Corrections, he had shoulder-length hair. It was cut initially, and he has gone through a two-year process attempting to be exempted from haircuts. Mr. Five Coat identified the book *The Paiute Cult* as a book which has written down the oral traditions referred to.

Following Mr. Five Coat's testimony, plaintiff took the stand on his own behalf. Testifying generally about the source of his religious beliefs, of which long hair is one, plaintiff stated that his grandfather had instilled in him a belief that a certain image was part of his religion. His grandfather, Mike Bad Old Man, wore moccasins and long hair and was the epitome of an Indian. His grandfather took him to sweat lodges and encouraged plaintiff to retain his Indian culture and customs. Although plaintiff's mother subjected him to Catholic teachings, plaintiff said that in his heart he was an Indian, and he kept Indian customs and cultures rather than conforming to Catholicism. Thus, when his hair was cut, he felt naked, as though part of his soul had been shaved. It jeopardized his way of thinking and countered the directions of authorities. It tortures plaintiff to have his hair cut and causes him mental distress. Furthermore, plaintiff feels rebellious when told to get his hair cut, because part of plaintiff is his hair; he testified that it is his religion and his personality. A person develops his Indian character traits just as would a Catholic.

Every Indian association plaintiff had came from his grandfather, who died when plaintiff was about fourteen. His grandfather had peace pipes and a sweat lodge and was in general a very religious man, whose nature was whole. Religion and nature are a way of living for the Indian, and long hair is their way of believing. Plaintiff stated that he had long hair in school, both as a teenager and as an adult, until forced to have it cut in prison. Plaintiff said he tried to enlist in the military service when he was seventeen, but when he was told that he would have to get a haircut, he decided not to enlist due to the importance of his belief regarding his hair.

In response to a question from the Court, plaintiff stated that one enters a sweat lodge naked in order to rid oneself of inner evilness and practices. It is similar to a sauna.

When questioned upon cross-examination, plaintiff stated that he was not aware of any written documents regarding Indian practices. His beliefs had been taught by his grandfather, a full-blooded Indian, whose beliefs in turn came from his ancestors. Plaintiff's father was not a full-blooded Indian, but his mother was. Nonetheless, he was raised in the Catholic

church by his mother. Although he respected Catholicism, he did not believe in it and he maintained long hair even when practicing Catholicism. Even as a child, plaintiff reiterated, he was a practicing Indian in his heart. Stating that he believes in Indian culture, plaintiff stated that no one tenet could be said to be more important than the others. When questioned as to why he had not then filed a lawsuit regarding the sweat lodge, plaintiff stated that the lawsuit regarding hair was a starting point for the whole, even though there is no order of importance among his religious practices.

Plaintiff was asked if he recalled answering an interrogatory, which asked him about the major tenets of his religion. Plaintiff stated that he remembered identifying hair length as "the major tenet" of his religious faith. He also remembered answering "hair length is the issue, and is tenet #1" when being asked to rank the tenets of his religion in importance.

Plaintiff stated that he identified with his Indian religion when he entered the Florida penal system. Upon being shown a questionnaire by counsel for defendant, plaintiff stated that he did not remember it, but that the handwriting looked as though it was his. He acknowledged that he "might have" told the prison officials that he was Catholic, but he did not remember talking about his religious preference.

Also on cross-examination, plaintiff stated that he believes in Jesus Christ as a messenger of God, but that he does not pray to him and never has. Instead, plaintiff testified that he worships God. He agreed that different Indians have different beliefs. When he entered the prison system, plaintiff reaffirmed, he was a practicing American Indian, practicing all tenets.

Plaintiff stated that he had been in prison in Montana before his incarceration in Florida. He attempted to escape while incarcerated in Florida; the attempt was simply a matter of being free. Plaintiff testified that he never returned to prison while on furlough, at which time his hair was down to his shoulders.

Defendant's first witness was Floyd Jolly, an ordained Baptist minister, who had been chaplain at Florida State Prison since July of 1981. As chaplain, Mr. Jolly's duties include coordinating religious activities. He testified that he had seen plaintiff occasionally in the chapel and that plaintiff had been present at an interdenominational service at least one time. Although he was acquainted with plaintiff, he had never counseled him. Upon the chaplain's identification of the various documents included in defendant's Exhibit A, the exhibit was entered into evidence.

Exhibit A-1, a paper entitled "Religious Orientation Information," was identified by the chaplain as being a form, probably filled out by the chaplain at the Reception and Medical Center, that was maintained as part of an inmate's file. The form indicates that, upon his entrance into the penal system, plaintiff identified himself as a Christian of the Catholic faith. The exhibit indicates that plaintiff had occasionally attended church before incarceration. Under the section marked "Comments," plaintiff had written that "my faith is undecided for now."

Exhibit A-2, a religious interview form from the Reception and Medical Center, indicated that plaintiff had stated that he believed in God, in prayer, that Jesus Christ is the son of God, and that the Bible is true and contains God's teachings. Plaintiff had also stated that he would like his minister, priest, or rabbi to visit him at his permanent location.

Exhibit A-4, a form entitled "Request to Attend Chapel Activities" indicated that plaintiff made a request early in 1982 to have his name removed from the Catholic list. At the same time, on a second "Request to Attend Chapel Activities" introduced as Exhibit A-5, plaintiff requested to be placed on the Episcopal service list. Finally, Exhibit A-6 was a letter from plaintiff, written in June, 1981, asking that his religious preference be listed as Indian religion rather than Catholic. The letter stat-

ed that plaintiff had always believed in his people's faith but that his mother had reared him as a Catholic. The letter also stated that plaintiff had love for all religious faiths, but chose to give his soul to God within his own culture and ethics.

On cross-examination, Mr. Jolly acknowledged that inmates go to the chapel for reasons other than attending services. He stated that he knew vaguely what a Medicine Man was. When asked by the Court if there was anything in the theology of Native Americanism or Catholicism, which would make them incompatible, the chaplain responded that he did not think they were compatible. He stated that plaintiff had never documented his religion.

On redirect examination, the chaplain stated that inmates come to him to discuss religious problems, family problems, scriptures, and religious practices. He stated that the majority of inmates are Protestant. He also stated that plaintiff had never come to him with a problem regarding his alleged inability to practice his Indian religion. When plaintiff asked the chaplain why he would go to a chaplain, who did not know about the Indian religion, the chaplain responded that it is the chaplain's responsibility to coordinate religious matters. Had plaintiff asked him about sweat lodges, drums, or pipes, so as to show his philosophies, the witness stated that he would have checked out plaintiff's religion. He stated that it would be plaintiff's burden to prove his religion and its tenets, and to establish a sincere interest in the religion. He stated that most religions have origins. Finally, he stated it must be determined whether security would be jeopardized by the practices sought.

Florida State Prison superintendent, Richard L. Dugger, testified next. Mr. Dugger identified defendants' Exhibits B and C, as Department of Corrections policy directives concerning inmate hair styles. He stated that he was familiar with prison grooming policy, which requires close-cropped, neatly trimmed hair for all inmates, without exception, religious or otherwise. He stated that the policy was pro-

mulgated for identification purposes so that an inmate could be identified promptly. An inmate's picture is taken at the Reception and Medical Center after his hair is shorn and the picture is made a part of the prisoner's file to be used for identification purposes in the event of escape. He stated that inmates may occasionally be rephotographed at three or four year intervals.

Mr. Dugger testified that Florida State Prison does not have a significant escape problem. When an escape occurs, flyers are distributed. Inmates have been recaptured that way. He noted that a death row inmate had escaped by donning a wig and mustache and that the escape had been facilitated by the change in appearance.

Mr. Dugger gave as an additional reason for the policy, his belief that it encourages conformity, a factor inherent in an institutional setting so as to obtain discipline. He stated that health and sanitation were also minor considerations for the haircut policy.

Mr. Dugger admitted on cross-examination that hair could be searched in order to facilitate security just as are clothes and cells. He also stated that a new picture could be taken of an inmate with long hair, but questioned as to when the picture would be taken. He noted that there would be a question as to which picture to send out in a flyer if an escape occurred and that an inmate could alter his appearance dramatically by cutting his long hair off. Although Mr. Dugger conceded that a wig could also be used to change an inmate's appearance, the short hair policy makes such changes slightly more difficult.

Mr. Dugger did not know whether Indians have a religion. He testified that he does not object to any religious practice that does not interfere with legitimate security interests of the institution of which the haircut regulation is a part.

Sgt. Leonard Ball, the institutional investigator at Florida State Prison, examined Exhibits B and C and affirmed that he did have knowledge concerning the reasons for the policy delineated therein. Sgt. Ball testified that, after an escape, the prison cir-

culates photographs from its institutional records. The pictures are taken at Reception and Medical Center, and retaken every five years. He testified that it would take time and money to keep retaking photographs as an inmate's hair grows.

· Sgt. Ball also testified as to defendants' Exhibit D, a composite photocopy of various inmates' institutional pictures juxtaposed next to their driver licenses. The driver license photos, showing the inmates with longer hair and facial hair, were intended to demonstrate that facial features are not distinct with such growth. Sgt. Ball stated that the majority of such inmates who escape are recaptured within a week, noting that hair could not be grown as fast as it could be cut off. Sgt. Ball also offered sanitation as a minor reason for the regulation. He stated on cross-examination that he does not object to long hair.

Finally, plaintiff took the stand again to testify. Regarding his appearances in the chapel, he stated that he is a musician, who has chosen to share his talents with other denominations, but that his faith has always been in his customs. He stated that the only frequent concerts held are in the chapel, and that he is attracted by any music; thus, he went to the chapel to sing, to play his guitar, and to be a part of the activities.

Plaintiff acknowledged on cross-examination that the writing on Exhibit A–1, including plaintiff's identification as a Catholic, the statement that he was Christian, and the statement that he was undecided, were all in his handwriting. He did not recall Exhibits A–2 and A–3, but admitted that Exhibits A–4 and A–5 had been filled in by himself.

Counsel for defendants handed plaintiff his response to interrogatories filed earlier in the lawsuit and asked him to read interrogatories # 35 and # 39 and his answers to these interrogatories:

# 35. List the major differences, if any, between your religion and other faithful American Indians who allow their hair to be cut.

Response: If there is a difference, it is to give up long hair in exchange for the sweat lodge. To me it is impossible to give up long hair. I know what's in my heart—spiritual belief and the existence of a Great Spirit (God), a power or being greater than man—and my natural creation, my hair included. As I was born.
# 39. Are the tenets of your religion described in Interrogatory # 15 of equal importance? If not, please relist them based on their importance, listing the most important first descending order of importance.

Response: Hair length is the issue, and is tenet # 1.

Plaintiff commented that hair length is the first issue, and that if he won, the next issue would be the sweat lodge.

Finally, plaintiff testified that he had been reared as a Catholic, but also as an American Indian. When he filled out the initial form concerning his religion, seven years ago, there was no Indian religion in the system, so plaintiff put himself down as a Catholic for protection and assistance, and also because his mother was still alive. Nonetheless, he was "100%" Indian. Plaintiff stated that "my hair is my soul belief," and that the hair issue has hurt his religious beliefs. He stated that he must have his hair, which is his religion and is needed for his well-being.

### Law

The extent to which a lawfully incarcerated prisoner in the Eleventh Circuit may exercise his religious beliefs is unclear. In *Brown v. Wainwright*, 419 F.2d 1376 (5th Cir.1970), the court affirmed a district court's dismissal, without hearing the claim of a Florida prison inmate that his religious liberties had been violated by prison policy requiring him to be clean-shaven, since he was a demigod in an established religion and his mustache was a gift from his Creator. The Fifth Circuit held that: "[t]he rule in question is applied to all inmates alike. For personal cleanliness and for personal identification under prison conditions, the rule appears to be neither unreasonable

nor arbitrary. There is no constitutional basis for our interference with this vital function." *Id.* at 1377 (citations omitted).

This brief opinion was followed shortly thereafter by another short (three-page) opinion in the case of *Brooks v. Wainwright*, 428 F.2d 652 (5th Cir.1970). In that case, a Florida State Prison inmate claimed that the shaving and haircut policy violated his Fifth and Fourteenth Amendment rights in that he had received "divine revelation" commanding him to follow Biblical law not to "round the corners of your heads, neither shalt thou mar the corners of thy beard." The district court dismissed the complaint as frivolous, and was upheld by the Fifth Circuit: "Here, as in *Brown*, the haircut and shave regulations promote 'cleanliness and * * * personal identification', so that, regardless of the source of the religious belief, the state has not enforced an unreasonable and arbitrary regulation." *Id.* at 653. Even though the religious exercise was based on a belief in a Supreme Being and the Book generally held to contain His revealed teachings, the *Brown* reasoning was held to control. The courts were not to interfere with reasonable state regulations.

Two years later, the Supreme Court addressed the question of an inmate's right to free exercise of religion while in prison. A district court had granted a motion to dismiss against a Buddhist prisoner who was not allowed to use the prison chapel or write to his religious advisor, and who had been placed in solitary confinement for sharing his religious materials with other inmates. While noting that federal courts are not to supervise prisons and that prison officials should be accorded latitude in the administration of prison affairs, the Supreme Court held that:

> If Cruz was a Buddhist and if he was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts, then there was palpable discrimination by the State against the Buddhist religion, established 600 B.C., long before

the Christian era. The First Amendment, applicable to the States by reason of the Fourteenth Amendment, ... prohibits government from making a law "prohibiting the free exercise" of religion. If the allegations of this complaint are assumed to be true, as they must be on the motion to dismiss, Texas has violated the First and Fourteenth Amendments.

*Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam) (citation and footnote omitted).

"Whatever validity the Fifth Circuit's *Brooks* rule may once have had, it has been severely undercut by *Cruz* and the subsequent cases that have reaffirmed the principle that prison regulations are subject to constitutional scrutiny." *Goulden v. Oliver*, 442 U.S. 922, 923, 99 S.Ct. 2848, 2849, 61 L.Ed.2d 290 (1979) (Blackmun, J., and Brennan, J., dissenting from denial of certiorari) (citations omitted). In *Goulden*, the Fifth Circuit had denied leave to appeal *in forma pauperis* the district court's dismissal of a complaint that Alabama prison authorities forced a prisoner to shave and cut his hair contrary to his religious beliefs as an Orthodox Jew. The dissent from the denial of certiorari noted that:

> While a decision based on evidentiary proof may well result in a finding that petitioner's religious beliefs are not sincere, or that the State's interests are sufficient to justify the restriction imposed on petitioner's professed religious practice, I am not yet prepared to say that there is no set of facts that would entitle him to relief.

*Id.* at 923–24, 99 S.Ct. at 2849–50 (footnote omitted).

Thus, it is now clear that claims concerning free exercise of religion should not be dismissed without "full-blown and careful judicial consideration of the issue ...." *Shabazz v. Barnauskas*, 598 F.2d 345, 348 (5th Cir.1979). In *Shabazz*, a Florida State Prison inmate claimed that the shaving requirements violated his First Amendment rights, since his Islamic religious faith required him to let his beard flow. The court

in *Shabazz* noted that *Brown* and *Brooks* have been construed by other courts as involving "idiosyncratic" or "facially insubstantial" claims. Other courts have verified that such complaints should not be dismissed for failure to state a claim. *Native American Council of Tribes v. Solem*, 691 F.2d 382 (8th Cir.1982) (Native American prisoners may be entitled to relief where not allowed to have friends and family members at sacred ceremonies at prison even though other Christians were allowed to have members present at religious services); *Dreibelbis v. Marks*, 675 F.2d 579 (3d Cir.1982) (need complete factual record regarding claim that hair grooming standards impermissibly infringed First Amendment freedoms of prisoner who claimed to be an ordained minister and deacon of the Church of Prophetic Meditation, which prohibits the cutting of hair from any part of the body); *Burgin v. Henderson*, 536 F.2d 501 (2d Cir.1976) (premature to dismiss without service claim of Muslim inmates that policy preventing them from wearing beards interfered with their free exercise of religion). Even summary judgment has been deemed inappropriate by at least one circuit, where plaintiff, a Cherokee Indian prisoner, claimed that his hair length had religious significance and defendants merely submitted a conclusory affidavit stating that hair length regulations were necessary for purposes of prisoner identification, security, hygiene, and safety. *Weaver v. Jago*, 675 F.2d 116 (6th Cir.1982).

In considering whether an inmate should be allowed to exercise his religious beliefs, the Court must examine the inmate's First Amendment rights in light of his status as a prisoner:

> [A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and

care the prisoner has been committed in accordance with due process of law.

*Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

In *Pell*, the court identified deterrence of crime, rehabilitation, and internal security as being legitimate objectives of the corrections system. *Id.* at 822–23, 94 S.Ct. at 2804.

In another First Amendment case, the Supreme Court observed that:

> [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism....
>
> But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

*Procunier v. Martinez*, 416 U.S. 396, 404–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974) (footnote and citation omitted).

Although sentenced prisoners have freedom of religion under the First and Fourteenth Amendment, their constitutional rights are subject to restrictions and limitations, and the court must accord wide ranging deference to prison administrators in the adoption of policies judged necessary to preserve internal order, discipline and security. *Bell v. Wolfish*, 441 U.S. 520, 545–47, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979).

In balancing plaintiff's First Amendment rights against institutional objectives claimed to be in conflict with plaintiff's

assertion of his right to free exercise of religious beliefs, the court must consider the sincerity of plaintiff's beliefs and whether his beliefs are in fact "religious." His sincerity is purely a factual issue. The nature of his alleged belief in long hair, however, is only partly a question of fact. It is also necessary to review established law in order to determine whether plaintiff's attempt to exercise his beliefs should be protected under the Free Exercise Clause of the First Amendment.

In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), Amish parents who were convicted of violating the state's compulsory school attendance law claimed that high school attendance was contrary to the Amish religion and way of life. The Supreme Court stated that:

> In evaluating those claims we must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief. Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards. ...

*Id.* at 215, 92 S.Ct. at 1533 (footnote omitted).

The court went on to find that the Amish way of life was a matter of deep religious conviction, not just personal preference, which was shared by an organized group and intimately related to daily living. *Id.* at 216, 92 S.Ct. at 1533. Because Amish objection to formal education was firmly grounded in central religious concepts, the Amish were exempted from the compulsory school attendance law.

A tenet need not be absolute in order to be protected. Instead, proof that a prac-tice is deeply rooted in religious belief is sufficient to elevate a claim to a level of constitutional significance. *Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir.1975); *see also Barrett v. Commonwealth of Virginia*, 689 F.2d 498, 501 n. 5 (4th Cir.1982); *Geller v. Secretary of Defense*, 423 F.Supp. 16, 17 (D.D.C.1976).

The fact that a tenet is not written is not dispositive:

> There is no requirement that a religion meet any organizational or doctrinal test in order to qualify for First Amendment protection. Orthodoxy is not an issue. The fact that Cherokees have no written creeds and no manmade houses of worship is of no importance. The Cherokees have a religion within the meaning of the Constitution ....

*Sequoyah v. Tennessee Valley Authority*, 620 F.2d 1159, 1163 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980).

*See also Weaver v. Jago*, 675 F.2d at 118; *Teterud v. Burns*, 522 F.2d at 360; *Gallahan v. Hollyfield*, 516 F.Supp. 1004, 1006 (E.D.Va.1981), *aff'd*, 670 F.2d 1345 (4th Cir. 1982).

Additionally, it should be noted that the United States Congress has recognized the existence of an American Indian religion:

> On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

42 U.S.C. § 1996 (1981).

Plaintiff, under 42 U.S.C. § 1983, not only has a constitutionally protected first amendment right but also has a statutorily protected religious right.

In two district court cases virtually on point with the instant issues, the district judge found each plaintiff's belief in long

hair to be a religious belief entitled to First Amendment protection. Because each plaintiff was found to be sincere in his beliefs, prison officials were enjoined from enforcing haircutting policies against those plaintiffs. Both cases were affirmed on appeal.

In *Teterud v. Gillman*, 385 F.Supp. 153 (S.D.Iowa 1974), *aff'd sub nom. Teterud v. Burns*, 522 F.2d 357 (8th Cir.1975), an American Indian prisoner sought, on the basis of his First Amendment rights, an injunction against the enforcement of a prison regulation which prohibited the wearing of long braided hair. Testimony indicated that Indian religion and culture are tied together, with no division between the sacred and the secular—i.e., everything is related to religion. Testimony further indicated that Indians live by nature, that it is a spiritual custom to cut hair to show grief or humility after the death of a close relative, and that the instilling of racial and cultural pride in a member of a racial minority is an important factor in successful rehabilitation. The district court found that:

> [H]air length is a tenet of the Indian religion. An Indian's hair length can have sufficient religious significance to make a forced cutting of that hair an encroachment on the Indian's First Amendment rights. An Indian, however, may wish to wear his hair in the traditional style for a variety of reasons. The court will not speculate as to why an Indian wears his hair one way or the other. It suffices to say that if an individual Indian's belief in the Indian religion is honest, made in good faith, and sincere, he should be allowed to wear his hair in the traditional style.

*Id.* at 156.

On appeal, the Eighth Circuit agreed that the wearing of long hair for religious reasons was protected from government regulation by the Free Exercise Clause, even though it was also a matter of tradition. 522 F.2d at 360. The court noted that long braided hair need not be an absolute tenet in order to enjoy protection. *Id.* Further-

more, the court found the fact that plaintiff had been an active leader in the Church of the New Song did not negate a sincere belief in the Indian religion, since "[t]he Indian religion, unlike Christian religions, is not exclusive. Its followers can, without contradiction, participate in different religions simultaneously." *Id.* at 361.

The court did not disregard such institutional needs as sanitary food preparation, safe operation of machinery, easy inmate identification, security against contraband, and personal cleanliness by inmates. Instead, the court held that such needs could be viably served by less restrictive alternatives which would not unduly burden prison administrators. *Id.* at 361–62.

In *Gallahan v. Hollyfield*, 516 F.Supp. 1004 (E.D.Va.1981), *aff'd*, 670 F.2d 1345 (4th Cir.1982), a prisoner who was an American Indian of Cherokee descent challenged a non-discriminatorily applied prison haircut policy, for the reason that his religious beliefs required the wearing of long hair. Plaintiff was found to have overtly practiced his religious beliefs since at least the fifth year, and to have preferred associating, prior to his incarceration, with other Cherokees who did not cut their hair.

The district court stated that it must first determine the sincerity of plaintiff's belief in the religious practice sought to be enjoined, then determine whether the rule's institutional purpose was legitimate and substantial as compared to plaintiff's First Amendment rights, and finally, whether the purpose could be achieved by reasonably narrower means. *Id.* at 1005.

The court found that plaintiff possessed a sincere belief in his religion, following testimony that the hair is recognized as a sense organ and that loss of hair equates to losing a part of the body. Although the plaintiff had indicated that there were no written creeds established, his assertion that he practiced his religion and had attended religious ceremonies prior to his incarceration apparently convinced the court that "these are true beliefs and that he has not merely adopted these beliefs as a convenient method of maintaining a hair-

style which to him is preferential." *Id.* at 1006. The court enjoined the enforcement of the haircutting policy against plaintiff.

On appeal, the Fourth Circuit stated that:

Prison regulations which affect a prisoner's right to worship must be "reasonably and substantially justified by considerations of prison discipline and order" and further must be "in a form substantially warranted by the requirements of prison safety and order." *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 863 (4th Cir.1975). 670 F.2d at 1346.

The court held that even if the proffered justifications of the necessity for quick identification, the fact that long hair provides a hiding place for contraband, and that long hair is unsanitary, were legitimate, they were not warranted in that less restrictive alternatives were available. The court noted that plaintiff could be forced to wear his hair in a ponytail and that he could be searched for contraband and required to keep his hair neat and clean. *Id.* at 1346–47.

Other cases, though less on point than the above-mentioned two, also support plaintiff's position, assuming the sincerity of his belief. In *Barrett v. Commonwealth of Virginia,* 689 F.2d 498 (4th Cir. 1982), a Virginia prisoner who converted to Islamic faith while in prison challenged the constitutionality of a statute which prohibited consideration of a legal name change for any prisoner. In that case, there was no dispute regarding the bona fides of his wishes, and there was no question that the name change might be a religious exercise protected by the First Amendment. Instead, it was claimed that disruption of identification records, and thus confusion in internal prison operation, the interstate detainer system, and efforts to recapture escaped prisoners, would be caused by the name change. Noting that incarcerated prisoners retained those First Amendment rights which are not inconsistent with their status as a prisoner, *id.* at 501, the court found the prohibition to be unreasonably broad, even though the government might

have a legitimate interest in adequate identification records and was not unreasonable in fearing prisoner misuse of legal name changes. The court held that "[t]he breadth of limitations on first amendment rights is manifestly relevant to an assessment of the reasonableness, and hence the constitutionality, of such encroachments," *id.* at 502. The court concluded that the state's "categorical refusal" to legally recognize religious names adopted by incarcerated persons was not "reasonably and substantially justified by considerations of prison discipline and order." *Id.* at 503, quoting *Sweet v. South Carolina Department of Corrections,* 529 F.2d at 863. The court did not, however, require that prison records be changed to reflect the new name.

In *Monroe v. Bombard,* 422 F.Supp. 211 (S.D.N.Y.1976), Sunni Muslims sought an injunction against enforcement of a no beard policy at a state correctional facility. An in-junction was issued by the district court, which stated that prisoners have a reasonable opportunity to exercise the religious freedom and that even a legitimate institutional policy cannot be pursued by methods which are overly broad in stifling fundamental personal liberties. *Id.* at 216. *See also Native American Council of Tribes v. Solem,* 691 F.2d at 385. In *Monroe,* the court stated that justifications could not be based on fear and apprehension, and that security and identification needs could be reasonably met through less restrictive means, such as periodic rephotographing of inmates and beard searches at reasonable intervals. The court concluded that "the various rationales for a no-beard rule posited by the state will not support the concomitant constitutional infringement on certain inmates' free exercise of their religion." 422 F.Supp. at 218.

At least one lower court has rejected the reasoning set forth in the cases cited above. In *Furqan v. Georgia State Board of Offender Rehabilitation,* 554 F.Supp. 873 (N.D.Ga.1982), a Sunni Muslim incarcerated on death row desired to grow a beard of two or three inches in accordance

with his Islamic faith. Prison policy required that inmates refrain from having long hair or beards. While conceding that plaintiff was sincere in his religious beliefs, the district court nonetheless denied plaintiff's motion for injunctive relief. The court found that the regulation was rationally and reasonably related to the goal of preventing escape, after having heard testimony that clean-shaven inmates with relatively short hair would be easier to recapture; and so finding, the court held that the record did not support a finding that periodic rephotographing would be a viable, less restrictive alternative.

In reaching its decision, the court rejected the balancing test employed by all the above-mentioned cases. Instead, the court read *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), as embracing a rational basis standard of review rather than the balancing used by other courts. Thus, the district court's determination that the regulation should be upheld was based upon a finding that the regulation was rationally related to security, without consideration of plaintiff's First Amendment rights. The court yielded to the "informed discretion" of prison officials and found that, because the alleged justifications were not founded merely on fear and apprehension, the regulation in question, "to the extent that it prohibits this Sunni Muslim at a maximum security prison from growing a beard in conformity with his religious beliefs, is not violative of the First Amendment." 554 F.Supp. at 881.

It should be noted that *Jones v. North Carolina Prisoners' Union* related to associational rights rather than the right to free exercise of religion, and that the majority in *Jones* stated that "[p]erhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls." 433 U.S. at 125, 126, 97 S.Ct. at 2537, 2538. Also, while the Supreme Court did indeed state that "[a]n examination of the potential restrictions on speech or association that have been imposed by

the regulations under challenge, demonstrates that the restrictions imposed are reasonable, and are consistent with the inmates' status as prisoners and with the legitimate operational considerations of the institution," *id.* at 130, 97 S.Ct. at 2540, that observation was followed with the observation that "[t]o begin with, First Amendment speech rights are barely implicated in this case." *Id.*

*Rogers v. Scurr*, 676 F.2d 1211 (8th Cir. 1982), is another case which upheld a prison regulation claimed violative of the right to exercise religious beliefs. This case was decided in the same circuit as was *Teterud v. Burns*. In *Rogers*, Islamic inmates sought, among other things, the opportunity to wear prayer caps and robes outside their prayer services at the institution. The district court held that prison officials must adopt a less restrictive alternative, even though the prohibition was deemed a reasonable method of preventing the concealment of contraband. The appellate court reversed. Holding that the prison officials had attempted in good faith to accommodate the inmates' religious beliefs, the court cited *Bell v. Wolfish* for the proposition that "[w]e must give deference to their judgment in weighing the competing interests here involved." *Id.* at 1216. The court found that:

> [N]o constitutional right of the prisoners was violated by the prohibition on wearing prayer caps and robes outside religious services. This matter will stay within the discretionary powers of the state prison officials to safeguard institutional security, and the court's order to the contrary is hereby vacated.

*Id.*

Interestingly, in reaching its decision, the *Rogers* court made no reference to the *Teterud* case. Instead, the *Rogers* court cited to an earlier Eighth Circuit case, *Proffitt v. Ciccone*, 506 F.2d 1020 (8th Cir. 1974), which was discounted by the *Teterud* court. The *Rogers* court instead relied upon a Third Circuit case in its decision:

As noted by the Third Circuit in holding that the district court erred in requiring prison officials to select the least restrictive alternative in regard to the problem of escorting segregated inmates to religious services:

> [I]t is the informed discretion of the prison administrator that controls, as long as it is reasonably related to a legitimate correctional goal, and not "a court's idea of how best to operate a detention facility."

*St. Claire v. Cuyler*, 634 F.2d 109, 117 (3d Cir.1980). (citation omitted). Further elucidating the issue of administrative discretion in matters of prison discipline, the *St. Claire* court held: "The deferential review required by the Supreme Court's decisions leaves no room for a requirement that prison officials choose the least restrictive regulation consistent with prison discipline." 634 F.2d at 114.

676 F.2d at 1215.

Thus, the Eighth Circuit appears to have retreated from its earlier, more liberal position regarding a prisoner's First Amendment rights. In *Teterud*, the balancing test was employed and the least restrictive alternative was to be used to meet institutional needs which conflicted with a prisoner's First Amendment rights. In *Rogers*, as in the Georgia District Court case, the court seemed less inclined to balance First Amendment rights against institutional needs, holding instead that deference to prison officials required that reasonable regulations be upheld.

### Findings

There is no doubt that the religious beliefs of the plaintiff in this case and of American Indians, teaches them not to cut the hair on the top of their heads or, in other words, have their hair cut. This is not a personal preference but a deep religious conviction that is shared by an organized group. An American Indian derives spiritual benefits from not having his hair cut.

This Court finds that although plaintiff may have been raised as a Catholic and attended Catholic religious services from time to time, he is an American Indian, believing and following the American Indian religion. The Court further finds that plaintiff, during the relevant period covered by this litigation, was and still is sincere in his religious beliefs. These particular religious beliefs have both constitutional and statutory protection. Those protections must be consistent with his status as a convicted, incarcerated felon.

This Court is persuaded that the reasoning and logic in *Furgan*, by Judge Owen Forrester, is the correct standard to follow. Rather than using the "least restrictive" standard adopted by some courts, the "striking of a balance between two competing interests" standard should be used. *Bell v. Wolfish*, 441 U.S. at 569–71, 99 S.Ct. at 1889–91; *Jones v. North Carolina Prisoners' Union*, 433 U.S. at 126, 97 S.Ct. at 2538.

Three reasons were advanced for the restrictive haircut regulation. One was discipline. The only evidence on this point is that by requiring conformity, all inmates are treated alike and no one has any special privilege with respect to hair length. This helps in maintaining discipline among the inmates. The second was health and sanitation, which was said to only have very minimal consideration. The third was security, which shall be expanded upon. All three of these reasons are legitimate penological objectives. *Pell v. Procunier.*

The length of hair is an important factor identifying an individual. By restricting the length of hair, law enforcement officials are aided in the capture of escapees. Plaintiff himself at one time escaped from custody. In today's world, long hair is worn by many people. Thus, when looking for a recent escapee with short hair, short hair limits the number of persons law enforcement officers need scrutinize. Since it takes a long period of time to grow long hair, an escapee cannot alter his natural hair length rapidly. True, he can use a wig, but that can be removed for identification purposes. The Court is convinced

from the testimony and picture display that the entire facial identity of an individual can be altered by changing hair styles. It is not reasonable to require prison officials to constantly take repeated photographs of inmates as they lengthen or shorten their hairstyles. The regulation hairstyle, while not at great variance with contemporary styles, makes it easier to recognize an inmate if he attempts to walk out of an institution with visitors when they depart.

Plaintiff is incarcerated at Florida State Prison, Florida's maximum security institution. As Judge Forrester found in *Furgan*, 554 F.Supp. at 880–81:

> [T]his court concludes that "[t]he informed discretion of prison officials that there is potential danger ... [is] sufficient for limiting rights even though this showing might be 'unimpressive if ... submitted as justification for governmental restriction of personal ... [religious expression] among members of the general public.'" *Jones*, 433 U.S. at 133 n. 9, 97 S.Ct. at 2541 n. 9 (quoting *Pell v. Procunier*, 417 U.S. 817, 825, 94 S.Ct. 2800, 2805, 41 L.Ed.2d 495 (1974)). This is not a case where the justifications are founded only on fear and apprehension. *See Teterud*, 522 F.2d at 361–62.

### Recommendation [2]

All requested relief should be denied and judgment should be entered for the defendant.

DONE and ENTERED at Jacksonville, Florida, this 14th day of July, 1983.

Harry E. Schlesinger
UNITED STATES MAGISTRATE

### APPENDIX 2

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

F. STARR GRIFFIN, Plaintiff,

vs.

RICHARD L. DUGGER, Defendant.

Case No. 79-758-Civ-J-B

---

**2.** Objections may be filed in accordance with 28 U.S.C. § 636 and Local Rule 6.02 ten (10) days after service of this document. Failure to do so

ORDER

This cause is before the Court upon the Complaint Pursuant to 42 U.S.C. § 1983, filed herein on August 27, 1979, by plaintiff F. Starr Griffin. Plaintiff alleges that his first amendment right to practice his religion has been unconstitutionally infringed by defendant's policy mandating short hair. Plaintiff seeks an injunction against enforcement of the policy as to him.

This matter was considered by the United States Magistrate, pursuant to standing order concerning assignment of state prisoner civil rights cases. The Magistrate filed a Report and Recommendation on July 14, 1983, recommending that the petition by dismissed. On July 19, 1983, the petitioner filed the following objection to the Report and Recommendation:

The Magistrate's conclusion that the prison regulation requiring short hair is reasonably related to legitimate penal objectives and does not unconstitutionally violate petitioner's first amendment right to practice his religion is contrary to law.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 6.02, Local Rules of the United States District Court for the Middle District of Florida, the Court will conduct a *de novo* review of plaintiff's claim.

The Magistrate found that petitioner "is an American Indian, believing and following the American Indian religion." The Magistrate also found that "the religious beliefs of the plaintiff in this case and of American Indians, teaches them not to ... have their hair cut." *See* Report and Recommendation at 32–33. The Magistrate further found that "plaintiff, during the relevant period covered by this litigation, was and still is sincere in his religious beliefs." *Id.* at 33. The Court has determined that the evidence in the record herein supports these findings of fact and the Court affirms them. It remains, therefore,

shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

to determine as a matter of law, whether the prison regulation requiring short hair unconstitutionally violates petitioner's sincere religious beliefs.

At the hearing, Richard L. Dugger, Florida State Prison Superintendent, testified that the Department of Corrections policy directives concerning inmate hair styles, *see* Exhibits B and C, which require "closely-cropped" and "neatly trimmed" hair for all inmates, are for the purpose of facilitating the identification of escaped inmates.[1] An inmate's picture is taken at the Reception and Medical Center after his hair is cut and the picture is made a part of the prisoner's file. Dugger testified that when an escape occurs, flyers with the escapee's picture on them are distributed, and that, in the past, this has facilitated the identification of and prompt recapture of the escapee.

The Court is aware that at least two circuits have adopted a "least restrictive means" standard of review for evaluating religious freedom challenges to prison short hair regulations and have held that such regulations violate the first amendment's guarantee of freedom of religion. In *Gallahan v. Hollyfield*, 670 F.2d 1345 (4th Cir.1982), the Court of Appeals for the Fourth Circuit held that a prison haircut regulation was unconstitutional because it restricted an inmate's right to exercise freely his sincere religious beliefs when less drastic alternatives were available. Similarly, in *Teterud v. Burns*, 522 F.2d 357 (8th Cir.1975), the Court of Appeals for the Eighth Circuit held that justification regarding an absolute prohibition against wearing long hair were either without substance or overly broad since those inmates whose appearance changes by growing long hair could be rephotographed for easy identification.

In this circuit, however, the standard of review to apply to religious freedom chal-

lenges to prison regulations is less clear. In a recent case challenging a prison regulation restricting the right of inmates to marry, the appellate court enunciated a standard composed of two parts:

> First, the prison regulation must further a substantial governmental interest. A regulation will be taken to further such an interest if it is rationally related to it. Second, a regulation's restriction ... must be no greater than necessary to protect the governmental interest involved.

*Bradbury v. Wainwright*, 718 F.2d 1538, 1543 (11th Cir.1983).

It is not clear that this establishes a least restrictive means standard of review for prison regulations in this circuit. Furthermore, this Court is informed by the more recent Eleventh Circuit decision in which the Court of Appeals explicitly declined to adopt a "least restrictive means" standard of review for this circuit. *Furquan v. Georgia State Board of Offender Rehabilitation*, 727 F.2d 1115 (11th Cir.1984). In *Furquan*, the Court of Appeals reviewed a Georgia prison hair and beard regulation which was justified by Georgia prison officials as rationally related to the legitimate state interest in facilitating identification of escaped inmates. In upholding the regulation, the appellate court ruled that it need not decide "whether the 'least restrictive means' test must be employed in this type of first amendment challenge, for under either standard the regulations attacked here are sound."

The evidence in this case is that the short-hair and no-beard rule is for this same purpose and that it has facilitated prompt recapture of escapees in the past. Furthermore, there is no viable "less restrictive" alternative. Therefore, this Court finds that in the instant case—under either standard—the prison haircut policy is not an unconstitutional violation of plaintiff's first amendment rights.

Accordingly, it is

---

1. Mr. Dugger further testified that the short hair policy also promoted prison discipline and health and sanitation. Since the Court finds

later in this opinion that identification is a sufficient reason to sustain the regulation, it has not considered these justifications for the policy.

ORDERED:

1. That petitioner's objection to the Magistrate's Report and Recommendation is hereby overruled.

2. That the Magistrate's Report and Recommendation, filed herein on July 14, 1983, is hereby adopted and confirmed and made a part hereof.

3. That the Clerk shall enter Judgment for defendant.

DONE AND ORDERED at Jacksonville, Florida, this 24 day of Sept., 1984.

s/Susan H. Black

UNITED STATES DISTRICT JUDGE