Anthony W. MARTINELLI,
Plaintiff-Appellee,
Cross-Appellant,

v.

Richard L. DUGGER, Mrs. Ana Gispert, Defendants-Appellants, Cross-Appellees,

Lt. T. Mowery, Sgt. E. Savoia,
Defendants.

No. 86–5159.

United States Court of Appeals,
Eleventh Circuit.

June 1, 1987.

---

8. *See supra,* p. 1496–97.

**1500**

Jason Vail, Asst. Atty. Gen., Tallahassee, Fla., for defendants-appellants, cross-appellees.

Joel V. Lumer, Miami, Fla., Carol Hewett, Tarpan Springs, Fla., for plaintiff-appellee, cross-appellant.

Before FAY and KRAVITCH, Circuit Judges, and MORGAN, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

George Brown, then an inmate at a Florida state prison, once argued to the former Fifth Circuit that he is an offspring of a God and a Mortal and that a prison regulation requiring prisoners to be clean-shaven infringed upon his constitutional religious liberties because he is himself an established religion and his mustache is a gift from his creator. *See Brown v. Wainwright,* 419 F.2d 1376 (5th Cir.1970).[1] The court dismissed Brown's petition without a hearing, finding that the prison rule "appears to be neither unreasonable nor arbitrary." *Id.* at 1377; *accord Brooks v. Wainwright,* 428 F.2d 652 (5th Cir.1970). Subsequent cases have made it clear that prison practices that allegedly conflict with constitutional rights of inmates may be subjected to more exacting scrutiny than that suggested in *Brown* when the inmate's constitutional claim is legitimate.[2]

---

1. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

2. In *Shabazz v. Barnauskas,* 598 F.2d 345, 347 n. 4 (5th Cir.1979), the court noted that the decisions in *Brown* and *Brooks* had been "severely undercut by *Cruz* [*v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)] and the subsequent cases that have reaffirmed the principle

*See, e.g., Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Shabazz v. Barnauskas,* 598 F.2d 345 (5th Cir.1979) (*Shabazz I*); *Harmon v. Berry,* 728 F.2d 1407 (11th Cir.1984); *Bridges v. Russell,* 757 F.2d 1155 (11th Cir.1985); *Shabazz v. Barnauskas,* 790 F.2d 1536 (11th Cir.1986) (*Shabazz III*).

In this case we re-examine the rights of state prisoners to obtain exemptions from prison rules that allegedly infringe upon constitutionally-protected religious freedoms. Two prison practices are challenged: a requirement that all inmates, except those who qualify for a medical exemption, be clean shaven and wear their hair cut short; and a practice of refusing to honor requests for a completely kosher diet.

## I. BACKGROUND

Appellee Anthony Martinelli, an inmate at the Dade Correctional Institution (DCI), a state correctional facility in south Florida, brought this action under 42 U.S.C. § 1983 against appellants Louie Wainwright, Secretary of the Florida Department of Corrections, and Ana Gispert, Superintendent of the DCI. The complaint also named as defendants Lt. T. Mowery and Sgt. E. Savoia, two corrections officers at the DCI.[3]

Appellee alleged that he is a sincere believer in the Greek Orthodox religion and that among the practices of his religion are eating a certain diet and not cutting his hair or beard. Martinelli claimed that appellants required him to cut his hair,[4] to be clean shaven,[5] and to eat food that was not consistent with his religious beliefs.[6] Appellants also allegedly threatened Martinelli with more stringent confinement if he failed to comply with these rules. Appellee sought declaratory relief and an injunction (1) prohibiting appellants from enforcing the prison hair length and shaving regulations against him, and (2) ordering appellants to supply appellee with an adequate diet consisting of: fresh fruits, fresh vegetables, eggs, milk, cheese, peanut butter, jelly, fruit juices, cereals, appropriate meats, and/or a full kosher diet.[7]

The district court granted Martinelli's motion to proceed in forma pauperis and

that prison regulations are subject to constitutional scrutiny."

3. These defendants were dismissed by the magistrate as not necessary to the award of declaratory and injunctive relief sought by appellee.

4. Fla.Admin.Code R. 33–3.02(6) provides that:
   Male inmates shall have their hair cut short to medium length at all times with no part of the ear or collar covered. Sideburns shall not extend beyond the bottom of the earlobes and will have straight lines with no flair at the base.

5. Fla.Admin.Code R. 33–3.012(6) provides that:
   All male inmates shall be clean shaven, provided, however, that an exemption from this requirement may be granted on the basis of a medical diagnosis when it is determined by the staff physician that shaving would be detrimental to the inmate's health. Inmates granted a medical exemption from the shaving requirement may be required to keep their facial hair closely trimmed with scissors or clippers. For the purpose of this rule, "closely trimmed" means trimmed so that no part of the facial hair exceeds the length prescribed by the physician as necessary to prevent the appearance or reappearance of skin disorders. If no specific length is prescribed,

then facial hair shall be kept trimmed to within one-quarter inch.

6. The Florida Department of Corrections Policy and Procedure Directive No. 2.02.10 addresses the implementation of food service standards for Florida correctional institutions. With respect to religious diets, the directive provides that one pork-free meal per day will be served and that religious diets must be approved by the superintendent. Part IV(B)(3) directs that:
   Inmates who wish to observe religious dietary laws shall be provided a diet sufficient to sustain them in good health without violating those dietary laws. *Exceptions may be made only in unusual cases where providing a special diet would:*
     a. *require excessive budgeting allowances*
     b. *create a threat to the security, order or effective management of the institution*
     c. *amount to unjustified special treatment of inmate receiving the special diet.*
   (emphasis added). As we discuss *infra,* appellants refused to provide Martinelli the items he requested or a full kosher diet because doing so would require excessive budgeting allowances.

7. Martinelli apparently has abandoned his request for the specific items in favor of a general request for a full kosher diet.

referred the case to a United States magistrate. After a hearing on appellee's motion for a temporary restraining order, the magistrate decided to treat Martinelli's section 1983 complaint as a petition for habeas corpus challenging conditions of confinement. 28 U.S.C. § 2254. The magistrate then: (1) enjoined Wainwright and Gispert to issue Martinelli a "kosher card" that would permit him to take his meals in the pork-free cafeteria line; (2) enjoined appellants from transferring Martinelli out of the DCI during the pendency of this action; (3) dismissed Sgt. Savoia and Lt. Mowery as defendants because they were unnecessary parties for injunctive relief; and (4) appointed an attorney to represent Martinelli. The magistrate reserved ruling on the question of the beard and facial hair rules pending a final hearing, but he cautioned appellants that "no punitive action may be taken against Mr. Martinelli because of the filing of this lawsuit." [8]

After the final hearing, the magistrate found that Martinelli has a constitutionally-protected interest in his diet, facial appearance, and beard length that exceeds the state's interest in regulating these practices. The magistrate went on to conclude that: (1) Martinelli has a present, sincere and deeply-rooted religious conviction that he should not eat pork or foods mixed with pork; (2) Martinelli has a present, sincere and deeply-rooted religious conviction that he should not shave his facial hair nor cut the hair of his head; and (3) Martinelli had exhausted state remedies because any further invocation of administrative remedies would have been futile. The magistrate accordingly preliminarily enjoined appellants from enforcing the hair length and beard regulation against Martinelli and ordered that Martinelli be allowed to take all of his meals in the pork-free cafeteria line.[9] The magistrate also ordered that Martinelli be immediately removed from disciplinary confinement, and recommended to the district court that the injunctions be made permanent.

After timely objections were taken to the magistrate's report and recommendations, the parties stipulated to the evidence submitted before the magistrate and the district court heard closing arguments on the merits of the action. Fed.R.Civ.P. 65(a)(2). Although the court agreed with the magistrate's finding that Martinelli was a sincere believer in the Greek Orthodox religion and that one of the tenets of his religion is that he must grow a beard and wear his hair long, the district court determined that *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and *Shabazz v. Barnauskas*, 600 F.Supp. 712 (M.D.Fla.1985) (*Shabazz II*), require that the prisoner's rights be balanced against prison objectives. Applying the two-part test articulated in *Shabazz II*,[10] the court concluded that although the shaving and hair length regulations further the state's interest in security, prohibiting Martinelli from growing a beard is not the least restrictive alternative because other prisoners are allowed to grow short beards for medical reasons.[11] The court therefore enjoined appellants to permit Martinelli to grow a beard to one-quarter inch in length in conformity with the medical exemption to the shaving re-

---

**8.** Martinelli was in fact placed in disciplinary confinement for refusing to obey a DCI officer's order to shave his beard. At the final hearing, the magistrate apparently accepted appellants' argument that they had not violated the prior mandate because Martinelli was being disciplined for violating the shaving and hair length regulations, rather than for filing the lawsuit.

**9.** The magistrate ordered that appellants did not, however, have to provide Martinelli with kosher service.

**10.** The district court in *Shabazz II* applied the standard we developed in *Bradbury v. Wainwright*, 718 F.2d 1538 (11th Cir.1983):

First, the prison regulation must further a substantial governmental interest. A regulation will be taken to further such an interest if it is rationally related to it. Second, a regulation's restriction ... must be no greater than necessary to protect the governmental interest involved.

*Shabazz v. Barnauskas*, 600 F.Supp. 712, 715 (M.D.Fla.1985).

**11.** *See supra* note 5. Testimony before the magistrate indicated that about 160 of the 647 inmates at the DCI were permitted to grow beards up to one-quarter inch in length for medical reasons.

quirement,[12] and prohibited appellants from placing Martinelli in disciplinary confinement for growing such a beard.[13]

With respect to the dietary issue, the district court concluded that the state did not have to provide Martinelli with a diet strictly conforming to his religious beliefs. The court enjoined appellants to allow Martinelli to eat at least one meal a day in the pork-free diet line,[14] but refused to order appellants to provide either the specific items requested by Martinelli or a full kosher diet.

## II. ANALYSIS

Two primary inquiries must be made in order to evaluate an inmate's claim that a prison practice infringes upon his or her constitutionally-protected religious freedoms. The trier of fact first must determine whether the prisoner is sincere in his or her asserted religious beliefs. *Shabazz v. Barnauskas,* 598 F.2d 345, 347 (5th Cir. 1979); *Furqan v. Georgia State Bd. of Offender Rehabilitation,* 554 F.Supp. 873, 876 (N.D.Ga.1982), *aff'd,* 727 F.2d 1115 (11th Cir.1984). Where the prisoner is found to be insincere in asserting the religious convictions, the claim is deemed "so

facially idiosyncratic that neither a hearing nor justification by the state for its rule [are] required." *Shabazz I,* 598 F.2d at 347. *Cf. Brown v. Wainwright,* 419 F.2d 1376 (5th Cir.1970); *Brooks v. Wainwright,* 428 F.2d 652 (5th Cir.1970).

Appellants contend that the district court erred in finding that Martinelli's religious beliefs regarding hair and beard growing are deeply-rooted tenets of the Greek Orthodox religion. Although our prior cases have not expressly imposed a requirement that the plaintiff demonstrate that his or her behavior is deeply-rooted in religious belief, the district court found support for such a requirement in *Shabazz II.*[15]

■ We conclude that proof of a connection between the allegedly protected practices and religious beliefs is properly considered an element of the plaintiff's proof that he or she is sincere in asserting that the beliefs are protected by the free exercise clause. There is no separate requirement that the claim be "deeply-rooted" in religious beliefs.[16] Although it is true that in order to have the protection of the free exercise clause a plaintiff's claims must be

**12.** *See supra* note 5.

**13.** The court amended its judgment on this point to state that appellants "shall not subject the plaintiff to administrative confinement or disciplinary confinement for growing his hair or beard in noncompliance with 33–3.02(6) if the plaintiff's hair and beard conform with the standard set forth in the Court's order."

**14.** Under Policy and Procedure Directive No. 2.02.10(IV)(B)(1), appellants were required to offer one pork-free meal per day. The court indicated that the fact that the DCI provides at least one pork-free meal to the prisoners allows Martinelli a reasonable choice in his food selection.

**15.** In *Shabazz v. Barnauskas,* 600 F.Supp. 712, 714 (M.D.Fla.1985), the district court implied that "whether the practice of wearing a beard is deeply rooted in the religious beliefs of the Islamic faith," is one of the elements of a prisoner's free exercise claim. The *Shabazz II* court apparently relied upon *Teterud v. Burns,* 522 F.2d 357 (8th Cir.1975), where the Eighth Circuit rejected an argument that a plaintiff must prove that wearing long hair is an absolute tenet of the Indian religion practiced by all Indians.

The court in *Teterud* held that "[p]roof that the practice is deeply rooted in religious belief is sufficient." *Id.* at 360.

**16.** Our decision in *Shabazz v. Barnauskas,* 598 F.2d 345, 347 (5th Cir.1979), supports this conclusion. In *Shabazz I,* we held that the district court should not have dismissed Shabazz's first amendment claim without a hearing "inquiring into plaintiff's alleged sincerely held religious beliefs and into the state's justifications for its regulations." We made no mention in *Shabazz I* of a separate inquiry into whether the beliefs were deeply rooted tenets of a particular religion.

Similarly, in *Furqan v. Georgia State Bd. of Offender Rehabilitation,* 554 F.Supp. 873 (N.D. Ga.1982), *aff'd,* 727 F.2d 1115 (11th Cir.1984), the court addressed the question of whether a beard growing practice is deeply rooted in religious beliefs in its discussion of whether the plaintiff was sincere. The court discussed the problem as follows: "Although proof is not required that the growing of a beard is an absolute tenet of the Sunni Muslims, some quantum of proof is required to show that the practice of growing a beard is a practice protected from governmental regulation by the free exercise clause." *Id.* at 876 (citations omitted).

rooted in *religious* beliefs,[17] *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972), *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 713, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981), *Theriault v. Carlson,* 495 F.2d 390, 394 (5th Cir.1974), *cert. denied,* 434 U.S. 871, 98 S.Ct. 216, 54 L.Ed.2d 150 (1977), the Supreme Court has admonished federal courts not to sit as arbiters of religious orthodoxy. *See Thomas,* 450 U.S. at 716, 101 S.Ct. at 1431 ("[I]t is not within the judicial function to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."); *Fowler v. Rhode Island,* 345 U.S. 67, 69, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953) ("[I]t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment."). The Court's discussion in *United States v. Seeger,* 380 U.S. 163, 184–85, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965), of the proper role of courts in reviewing military conscientious objector claims supports this analysis:

> The validity of what [a conscientious objector] believes cannot be questioned.... Local boards and courts in this sense are not free to reject beliefs because they consider them "incomprehensible." Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious.
>
> But we hasten to emphasize that while the "truth" of a belief is not open to question, there remains the significant question whether it is "truly held." This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact ....

A claimant meets this initial burden, therefore, if he or she proves that the beliefs are truly held and religious in nature.

■ Applying this standard to the facts of this case, we find that the district court's conclusion that appellee was sincere is not clearly erroneous. Appellants concede that Martinelli's beliefs that he should eat kosher meats and that he should refrain from cutting his hair or beard were sincere in that they were truly held. In addition, the evidence was sufficient to support a finding that Martinelli was sincere in that his claims were rooted in religious beliefs. Evidence before the magistrate indicated that the laws of the Greek Orthodox religion [18] support Martinelli's assertion that the practice of his religious beliefs

17. Appellants suggest that the Court's statement in *Yoder* that a plaintiff's claim must be "rooted" in religious beliefs in order to qualify for protection under the free exercise clause is inapplicable to prisoners. Rather, appellants argue that inmates must prove that their claim is *deeply* rooted in religious beliefs in order to be constitutionally-protected. *See Teterud v. Burns,* 522 F.2d 357 (8th Cir.1975); *Weaver v. Jago,* 675 F.2d 116 (6th Cir.1982).

Appellants' argument is untenable. It is apparent from their argument that they perceive the import of the requirement that a claim be "deeply" rooted in religious beliefs to be that an inmate's claim, even though sincerely felt, should be deemed unprotected by the free exercise clause if the inmate's belief is only loosely supported by the teachings of the religion of which he or she is a member, or if only a minority of the members of the religion adhere to the particular religious practice. Although it is true that some inmate claims may be so idiosyncratic as to be insincere, *see Brown v. Wainwright,* 419 F.2d 1376 (5th Cir.1970), *Brooks v. Wainwright,* 428 F.2d 652 (5th Cir. 1970), for the judiciary to attempt to screen out mainstream practices of a particular religion from those practices to which only a minority of believers adhere, would be contrary to the Supreme Court's teachings in *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), and *Fowler v. Rhode Island,* 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953). Moreover, although inmates surrender some first amendment rights upon incarceration, "the prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Inmates' first amendment claims often fail, therefore, not because of a heightened threshold showing that is imposed upon their claims of protected activity, but because of the uniquely compelling state interests in the prison context. *See Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).

18. Testimony before the magistrate indicated that the writings in *The Rudder (Pedalion)* are laws of the Greek Orthodox church. A copy of excerpts from *The Rudder (Pedalion)* was admitted into evidence before the magistrate.

requires that he refrain from cutting his beard or hair[19] and that he eat kosher meats.[20] Although appellants may be correct in arguing that these are optional practices in the Greek Orthodox religion, there is no requirement that a belief be held by a majority of the believers in a particular religion.[21]

When the court finds that the inmate has a sincere free exercise claim, this circuit assesses the validity of the prison practice under the "least restrictive means" test. *Shabazz v. Barnauskas*, 790 F.2d 1536, 1539 (11th Cir.1986); *Bradbury v. Wainwright*, 718 F.2d 1538 (11th Cir.1983).[22] The *Bradbury* test, applied to inmate free

**19.** Canon XCVI of the *Pedalion* provides:

Those who have put on Christ through baptism have solemnly promised to emulate and imitate the manner of life He led in the flesh. As touching, therefore those who arrange and dress the hair of their head by contriving to plait or waive it in a fashion which has disastrous effects on beholders, and hence offers a lure to unbolstered souls, we undertake to treat them in a fatherly fashion with a suitable penance, while training them like children and teaching them how to live in a sober and sane manner, with the object of enabling them to lay aside the deception and vanity resulting from materiality in order that they may bend their minds toward a life which is perpetually unruffled and blissful, and to enjoy chaste association in fear, and to approach God as near as possible through purity of life, and to adorn the inner father than the outer man with virtues and benignant and blameless manners, so that they may not have any trace left in them of the rudeness of the adversary. If, however, anyone should conduct himself in a manner contrary to the present Canon, let him be excommunicated.

In a footnote to the section offering an interpretation of this Canon, the *Pedalion* spells out what practices are to result in excommunication under the Canon:

Those too incur the excommunication of this Canon, according to Zonaras, who do not put a razor to their head at all, nor cut the hair of their head, but let it grow long enough to reach to the felt like that of women .... *This excommunication is incurred also by those who shave off their beards in order to make their face smooth and handsome after such treatment, and not to have it curly, or in order to appear at all times like beardless young men* .... Note that *the present Canon censures the priests of the Latins who shave off their moustache and their beard and who look like very young men and handsome bridegrooms and have the face of women. For God forbids men of the laity in general to shave their beard, by saying: "Ye shall not mar the appearance of your bearded chin" (Lev. 19:27)....* The Apostles and their Injunctions, Book I, ch. 3, command that *no one shall destroy the hair of his beard* ....

(emphasis added). With respect to cutting one's hair, the *Pedalion* indicates that "the laity ought to cut their hair unaffectedly, unpretentiously, and inartifically." "[I]t is also forbidden to cut [one's hair] and to shave it with certain circular-

ities roundabout." *The Rudder (Pedalion)*, Canon XCVI, Concord, at 405.

Father Elias Chourzamanis, an ordained Greek Orthodox priest, testified that he interprets this Canon as making it "imperative" that beards be long and that hair should be "not too short, not too long, just use common sense."

**20.** The *Pedalion* indicates that:

[T]hose who kill quadrupeds or birds with a gun and who fail to slaughter them at once so as to drain out all their blood, sin greatly, as eating meat in the blood of its soul and transgressing the present Apostolical Canon.... So as soon as hunters kill game, they ought immediately to slaughter it and drain out all the blood in it, just as is commanded by God, who says: "And whatsoever man there be of the children of Israel, or of the strangers that sojourn among you, hunteth and catcheth any beast or fowl that may be eaten; he shall drain out the blood thereof and cover it with dust of the earth" (Lev. 17:13).

Father Elias Chourzamanis, an ordained Greek Orthodox priest, testified that the *Pedalion* advises people to stick to the Old Testament tradition of draining all the blood from meats. Although adhering to this tradition is impractical according to Father Chourzamanis, "if a man so chooses ... he can practice these things because they are postulated in the pedalion and they are borrowed from the Old Testament."

**21.** *Furqan v. Georgia State Bd. of Offender Rehabilitation*, 554 F.Supp. 873 (N.D.Ga.1982), aff'd, 727 F.2d 1115 (11th Cir.1984), supports our conclusion. In *Furqan*, the district court concluded that the inmate/plaintiff was sincere in his asserted religious beliefs where testimony indicated that growing a beard is "not an absolute requirement" of the plaintiff's religion, "but is strongly recommended." *Id.* at 876.

**22.** We note that the Supreme Court has granted certiorari in *O'Lone v. Estate of Shabazz*, —— U.S. ——, 107 S.Ct. 268, 93 L.Ed.2d 245 (1986), in order to resolve the disagreement among the circuits as to the proper standard for determining when a prison regulation must yield to an inmate's free exercise claims. *See generally* Annotation, *Validity Under Federal Law of Prison Regulations Relating to Inmates' Hair Length and Style*, 62 A.L.R.Fed. 479 (1983). The en banc Third Circuit, in *Shabazz v. O'Lone*, 782 F.2d 416 (3d Cir.1986) (en banc), decided that its prior standard for evaluating inmate first

exercise claims by this court in *Shabazz III*, involves a two-step inquiry:

> First, the prison regulation must further a substantial government interest. A regulation will be taken to further such an interest if it is rationally related to it. Second, a regulation's restriction ... must be no greater than necessary to protect the governmental interest involved. This two-part standard should be applied with a wide-ranging deference to the expert judgment of prison administrators.

*Bradbury*, 718 F.2d at 1543.

■ We conclude that the hair length, shaving, and religious diet regulations are rationally related to substantial government interests. Appellee concedes that the government interests in maintaining prison security,[23] in identification of escapees,[24] and in avoiding prison budget overruns[25] are substantial. Appellee seems to argue, however, that the relationship between the

regulations at issue here and the interests asserted is irrational under the *Bradbury* test.

Although the evidence linking the challenged regulations to the asserted interests was less than overwhelming and some other prison systems do not deem it necessary to impose similar regulations,[26] the evidence was sufficient to support a conclusion that the regulations in this case are rationally related to the substantial interests advanced. As to Florida's no beard rule, this conclusion is compelled by our decisions in *Shabazz III*, *Maimon v. Wainwright*, 792 F.2d 133 (11th Cir.1986), and *Brightly v. Wainwright*, 814 F.2d 612 (11th Cir.1987) (per curiam).[27] A similar conclusion is required as to the hair length rules because they serve the same interests as the no beard rule. *See Maimon*, 792 F.2d at 133 (upholding Florida regulation requiring that sideburns be unflared and no longer than the inmate's ear lobe). Finally,

---

amendment claims must be modified because it "provides inadequate protection for [inmates'] free exercise rights." *Id.* at 420. In its place, the court imposed a requirement that the state prove that the challenged regulations "were intended to serve, and do serve, the important penological goal of security, and that no reasonable method exists by which appellants' religious rights can be accommodated without creating bona fide security problems." *Id.*

We express no view as to the similarities or differences between the Third Circuit standard presently before the Court in *O'Lone* except to note that it is the policy of this circuit, where we have decided the question of law presented, to continue to apply that law despite a grant of certiorari in a similar case. We do, however, join the Fifth Circuit in "pray[ing] that the Supreme Court in *Shabazz v. O'Lone* will bring order to this unholy mess." *Udey v. Kastner*, 805 F.2d 1218, 1219 n. 1 (5th Cir.1986).

**23.** Evidence before the magistrate indicated that in prisons without shaving and hair length regulations, inmates had been caught with contraband or weapons hidden in their long hair. Moreover, Randall Mobley, assistant superintendent at the DCI, testified that whenever special exemptions are granted to prison rules, other inmates who have not been granted an exemption may feel resentment toward those receiving special treatment, resulting in friction between inmates.

**24.** Testimony before the magistrate indicated that identification of escaped inmates was made more difficult where the inmate had grown long

hair and a beard because the inmate might appear substantially different with long hair and a beard than he did when he was last photographed.

**25.** DCI officials testified that they investigated the possibility of providing full kosher meals for inmates seeking such a religious diet but rejected the alternative because it would be too expensive.

**26.** A court-requested survey in *Moskowitz v. Wilkinson*, 432 F.Supp. 947 (D.Conn.1977), found that of the 45 states responding: 20 allowed beards in all institutions; 2 allowed beards in certain types of institutions; and 1 allowed beards after an initial, clean-shaven, photograph. However, as the Eighth Circuit observed in commenting on this evidence, "[w]e believe it significant that although 21 states allow inmates in all institutions to grow beards, prison officials in 22 other states have concluded, in their informed discretion, that the growing of beards by inmates in their institutions is unacceptable." *Hill v. Blackwell*, 774 F.2d 338, 344 (8th Cir. 1985).

**27.** In affirming the district court's judgments against the inmates, the *Shabazz III*, *Maimon* and *Brightly* courts necessarily found that Florida's no beard rule is rationally related to substantial government interests. Indeed, the district court in *Shabazz* had found that Florida's no beard rule "served a legitimate penological interest in preventing escapes." *Shabazz v. Barnauskas*, 790 F.2d 1536, 1538 (11th Cir.1986).

Florida's prison dietary rules [28] are rationally related to the goal of avoiding excessive administrative expense.[29]

■ Having concluded that the institutional practices at issue further substantial government interests, we turn to the second prong of the *Bradbury* test. Appellants contend that the district court erred in finding that the medical exemption to the no beard rule is a less restrictive alternative.[30] We agree. First, the medical exemption is not an "alternative" to the no beard rule at all in the sense that, if one accepts as true the rationales for the no beard rule, inmates with one-quarter inch beards present a greater security risk than inmates without beards. Second, the "alternative" is not less restrictive on Martinelli's free exercise interests unless one assumes that cutting his beard at the skin is a greater violation of his religious beliefs than cutting his beard one-quarter of an inch from his skin. This assumption is not obviously true, and Martinelli has at no point argued that a short, trimmed beard would be better than no beard at all.[31] Finally, we note that the existence of the medical exemption does not in any way defeat appellants' claimed interests in support of the shaving and hair length regulations. The medical exemption is granted only where the staff physician determines "that shaving would be detrimental to the inmate's health." Moreover, evidence indicated that the fact that some inmates are allowed to grow one-quarter inch beards by virtue of the medical exemption has created friction among inmates and other security problems at the DCI.

**28.** *See supra* note 6.

**29.** Although Martinelli claims that there was insufficient evidence to support the conclusion that refusing to provide him a kosher diet would "require excessive budgeting allowances," Florida Department of Corrections Policy and Procedure Directive, No. 2.02.10(IV)(B)(3)(a), we find that the evidence adequately supported the rationality of the relationship between appellants' failure to provide full kosher meals and the interest in avoiding excessive budgeting allowances. Directive No. 2.02.10(IV)(B)(3) requires that Florida correctional institutions provide religious diets that are sufficient to sustain the inmates except in "unusual cases," such as where doing so would require excessive budgeting allowances. Our prior cases suggest that prison administrators' judgments as to what religious diets are too expensive are entitled to some level of deference. *Walker v. Blackwell,* 411 F.2d 23, 26 (5th Cir.1969); *Elam v. Henderson,* 472 F.2d 582, 583 (5th Cir.), *cert. denied,* 414 U.S. 868, 94 S.Ct. 177, 38 L.Ed.2d 117 (1973). We need not, however, decide the continued vitality of these cases because uncontroverted testimony of Randall Mobley, assistant superintendent at the DCI, indicated that DCI administrators investigated the possibility of providing a full kosher diet alternative for inmates and concluded that:

[A]s we have found or had been advised through our process of checking and trying to research [the possibility of providing a full kosher diet alternative for inmates], the cost factor involved in providing for kosher food and a kosher environment for the eating of that food would be beyond the budgetary constraints currently mandated for our institution to operate within by the legislature of Florida.

This uncontroverted testimony indicates that DCI's refusal to provide Martinelli a full kosher diet was rationally related to its legitimate interest in avoiding cost overruns.

As we indicated *supra* note 7, Martinelli apparently chose not to seek anything more than a kosher diet before the magistrate and at trial. His brief in this appeal renews his request for several specific foods (fresh vegetables, fresh fruits, peanut butter, jelly, etc.) and asserts that these foods were sought throughout this action. Assuming the issue was properly preserved, the magistrate and the district court did not find that these specific items were part of Martinelli's religious beliefs. The magistrate found that Martinelli "has a present, sincere, and deeply-rooted religious conviction that he should not eat pork or foods mixed with pork." The district court construed Martinelli's claim as follows: "it is against his religion to eat pork." Both the magistrate and the district court concluded that Martinelli's belief that he should refrain from eating pork was sincere. Martinelli does not allege that the district court was clearly erroneous in failing to find that his claim that he must eat the enumerated foods was sincerely held and rooted in religious beliefs. In any event, there was no evidence presented to support Martinelli's claim for anything other than kosher meats. Martinelli's claim for specific foods was, therefore, also properly rejected.

**30.** The district court decided that the medical exemption was a less restrictive alternative without either party having made this argument. Even in this appeal, Martinelli does not argue for the one-quarter inch beard that would be permitted under the medical exemption.

**31.** *See supra* note 30.

■ Martinelli argues that periodic re-photographing of inmates would allow Martinelli to grow long hair and a beard without sacrificing prison security. This argument was expressly rejected by the court in *Shabazz III:*

> This court is not able to say that preparation, storage, maintenance, and dissemination to the world of law enforcement agencies (and other sources) two photographs to be used to recapture an escapee is a feasible means of furthering the state's interest in identification. We cannot say it works as well to present a potential source of identification with two pictures. Moreover, the argument overlooks that a beard is not static. A photograph of a prisoner with a beard may soon be out of date. A beard can grow longer, be cut shorter, be trimmed or altered, and even the color of it changed.

*Shabazz v. Barnauskas,* 790 F.2d 1536, 1540 (11th Cir.1986). We find no principled basis for distinguishing this holding in *Shabazz III. See Maimon v. Wainwright,* 792 F.2d 133 (11th Cir.1986) (*Shabazz III* controlling in free exercise challenge to Florida grooming regulations); *Brightly v. Wainwright,* 814 F.2d 612 (11th Cir.1987) (per curiam) (same).

■ We therefore reverse the judgment of the district court enjoining appellants to permit Martinelli to "grow his beard to one-quarter inch in length in conformity with the medical exception in Rule 33–3.-02(6), F.A.C." Martinelli is not entitled to exemption from the shaving and hair length rules on the basis of his religious beliefs. We also reverse the provision of the district court's amended judgment enjoining appellants to "not subject plaintiff to administrative confinement for growing his hair or beard in noncompliance with 33–3.02(6) if the plaintiff's hair and beard conform with the standards set forth in the court's order." The portion of the district court's final injunction directing that "[t]he plaintiff will be allowed to eat at least one meal a day in the pork-free diet line" is vacated; the issue is remanded to the district court for reinstatement of the spirit of the court's prior order: "Plaintiff shall be allowed to eat in the pork-free line when available, and at all other meal times, he shall be permitted to choose items which are not pork in the regular serving line." The remainder of the district court judgment is affirmed.

AFFIRMED in part; REVERSED in part; and REMANDED.