[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 23, 2008
THOMAS K. KAHN
CLERK

No. 07-13596
Non-Argument Calendar
_____

D. C. Docket No. 05-60019-CV-AJ

HERBERT LEE HATHCOCK, JR.,

Petitioner-Appellant,

versus

JEFFREY S. COHEN, Detective of Broward Sheriff
Department,
SGT. MICHAEL CLARK,
JOSEPH AIMEE RUSSO, Detective,
BENYA A. KOOS, Detective,
SHERIFF KENNETH JENNE, Sheriff of Broward County,
et al.,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 23, 2008)**

Before CARNES, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Herbert Hathcock, a <u>pro se</u> state prisoner appeals the district court's grant of summary judgment on his 42 U.S.C. § 1983 action alleging defendants violated his right to the free exercise of his Islamic religion. After review, we affirm.

## I. BACKGROUND

Between July 21, 2004 and July 12, 2005, Hathcock was a pretrial detainee in jails operated by the Broward County Sheriff's Office ("BSO"). Defendant Rick Braswell is the BSO's Jail Chaplain. Defendant Emilio Ponz is a Sergeant at the Joseph Conte Facility ("Conte"), a jail that housed Hathcock. Hathcock, a practicing Muslim, claims that, while in Broward County jails, he was prevented from (1) wearing a headcovering called a Kufi cap, (2) attending weekly Friday prayer services, known as Jumu'ah, and (3) eating kosher meals on some days during Ramadan.

### A. Broward County Jail Policy

The BSO's religious services policy is Standard Operating Procedure Policy Number 7.14 ("SOP 7.14"). The policy allows inmates to practice their religion unless there is "documentation indicating a direct threat to the security or orderly operation" of the jail or "the activity . . . would pose a danger to staff." SOP 7.14.

2

The Chaplain coordinates religious services and uses volunteers or volunteer clergy. SOP 7.14(A). The policy requires volunteers who conduct religious services to contact the Chaplain for clearance, training, and scheduling of programs. SOP 7.14(B).

According to Chaplain Braswell, SOP 7.14 does not prohibit any religion from holding ceremonies at the jail "provided that there is an outside religious leader or volunteer who can be located and who agrees to conduct and preside over the services." The BSO requires outside volunteers, rather than inmates, to perform religious ceremonies to maintain security and discipline in the jail by avoiding "the risks associated with leaving inmates unsupervised and to avoid creating an environment where inmates would have too much power." Chaplain Braswell must approve any volunteer who performs religious services at the jail.

The BSO uses volunteer Imams, Muslim religious leaders, to conduct Jumu'ah services. Consequently, the frequency of Jumu'ah services turns on the availability of volunteer Imams and is not set by Chaplain Braswell. While Hathcock was in BSO jails, Jumu'ah services usually were held twice a month. Any inmate could attend scheduled services if he requested to do so. Inmates may also meet privately with their own clergy, discuss their religion with other inmates and pray in their cells.

3

With regard to religious apparel and items, SOP 7.14(D) states:

> Authorized religious items and liturgical apparel are those essential to the practice of one's faith. . . . Any religious items or liturgical apparel not approved by the chaplain's office will be considered contraband and confiscated. . . . Inmate requests for religious items and liturgical apparel will be sent to the chaplain's office for approval. . . . The Broward Sheriff's Office DODCC or the chaplain will not supply inmates with liturgical apparel or religious items. Each inmate is responsible for obtaining approved liturgical apparel or religious items through a representative of his . . . faith, a friend, or a family member. . . . Inmates will be allowed to wear approved liturgical apparel in their cell, dayroom, and to and from religious services.

SOP 7.14(D). According to Chaplain Braswell, under SOP 7.14, inmates at BSO jails may possess religious apparel "essential to their individual faith," such as a Kufi cap for a Muslim inmate. The Chaplain and the BSO do not supply religious apparel, but will give inmates donated religious items if available. Inmates may submit their own religious items or apparel, or those provided by outside parties, to the Chaplain's Office for approval.

As to "special diets" required by a religion, SOP 7.14(E) states:

> Special diets corresponding to religious holidays or required by religious doctrine are available upon the inmate's written request to the chaplain. Confirmation will be given as soon as possible thereafter. . . If the chaplain approves the request, it will be forwarded to the food services supervisor who will, in coordination with the chaplain, plan and implement the special diet.

SOP 71.4(E). Chaplain Braswell approves requests for special diets after

confirming the sincerity of the inmate's beliefs through the inmate's religious leader.

**B.    Hathcock's Religious Requests**

On August 16, 2004, shortly after transfer to Conte, Hathcock submitted a request asking whether the facility provided Muslim inmates with a Quran and Jumu'ah services.  The Chaplain's Office responded the next day that a Quran was forthcoming, Jumu'ah services were held the first and third Fridays of every month, and Hathcock's name had been added to the Muslim Service List.

On August 16, 2004, Hathcock submitted another request asking for a Kufi cap, as follows:

> Do you have any Kofi Caps[?]  If you do can you please send me one[?] If not can I have one sent in from home or is it some way/other that a Muslim inmate can obtain one?

Hathcock asked when Jumu'ah services were performed and if he could attend. On August 27, the Chaplain's Office responded that Hathcock could "bring in [his] religious materials to [the Chaplain's Office] between 9am – 4 pm Monday thru Friday,"  Jumu'ah services were held every Friday at 12:30 p.m., and Hathcock's name would be added to the list to attend services.

On August 23, 2004, a deputy at the jail approached Sergeant Ponz regarding Hathcock's Kufi cap request.  Ponz told the deputy that Hathcock

5

needed to submit a request to the Chaplain's office, but did not forbid Hathcock from wearing a Kufi cap or order any subordinate to prevent Hathcock from doing so. Ponz never had any direct contact with Hathcock. On the same day, the deputy told Hathcock that Sergeant Ponz said Hathcock could not wear his Kufi cap in the jail.

The deputy, at Ponz's behest, gave Hathcock an inmate request form and told him to submit it to the Chaplain for permission to wear the Kufi cap. Hathcock prepared and submitted to the deputy his August 23 inmate request form, but did not receive a response because the Chaplain's Office never received it.[1]

Hathcock maintains that his August 23, 2004 inmate request was not to obtain a Kufi cap, but for permission to wear one already in his possession. In any event, Hathcock appears to have begun wearing a Kufi cap at some point. Shortly after being transferred to the North Broward Bureau jail,[2] Hathcock lost the cap when he left it in his uniform, which was sent to the laundry. On September 30,

---

[1]Hathcock filed a second inmate request on August 30, complaining that he had not received a response to his August 23 inmate request and asking if he could wear his Kufi cap to court. On September 16, Hathcock filed a third inmate request stating that he had already submitted an inmate request for permission to wear a Kufi cap and asking for help getting the approval he needed. The record is silent as to the response to these two inmate requests.

[2]Between September 20 and October 22, 2004, Hathcock was in an isolation cell because of possible MRSA (Methicillin-resistant Staphylococcus aureus) exposure.

2004, Hathcock completed an inmate request asking the Chaplain's Office to provide him with a replacement Kufi cap and asking when Jumu'ah services were held. The Chaplain's Office responded the next day that their religious apparel was donated, they did not have any Kufi caps available, and Jumu'ah services were held the second and fourth Fridays of each month.

The Chaplain's Office has no record of whether any religious materials were ever submitted to it for approval for Hathcock's use. However, Chaplain Braswell indicated that, had Hathcock submitted a Kufi cap, a prayer rug or a Quran for inspection, they would have been approved as items essential to Hathcock's Muslim faith, and Hathcock would have been permitted to wear the Kufi cap in his cell, in the dayroom and to and from religious services.

On October 6, 2004, Hathcock submitted another inmate request asking for permission to have a Kufi cap, a prayer rug and a Quran sent to him "from the outside" for Ramadan. The Chaplain's Office responded the next day that Hathcock could have someone bring the items to the Chaplain's Office between 9:00 a.m. and 4:00 p.m., Monday through Friday.

While housed in BSO jails, Hathcock was on the list to attend Jumu'ah services and could attend whenever they were held, except when he was in isolation. Between July 22, 2004 and April 25, 2005, when Hathcock filed this

action, Hathcock attended Jumu'ah services thirteen times, missing only three that were held while he was not in isolation.

On September 11, 2004, Hathcock asked about receiving kosher (pork-free) meals during Ramadan, which began on October 16, 2004. Hathcock was told to submit the required form to the Chaplain's Office, which he did on September 15. Hathcock listed his place of worship as "this jail" and stated that he did not remember the name of his Imam, but did know that he was in the jail "on Fridays." After reviewing the form, on September 22, the Chaplain's Office asked Hathcock to provide them with his place of worship and his Imam's name and contact number. On October 7, Hathcock submitted another request for kosher meals, but the Chaplain's Office advised Hathcock that it could not confirm the sincerity of his belief based on the information Hathcock had provided and that his request was being forwarded to an Imam.

On October 20, Imam Unal Coban interviewed Hathcock and completed a form indicating that Hathcock's belief was sincerely held. On October 21, Chaplain Braswell approved Hathcock's special diet request and forwarded it to Food Services. However, prison logs indicate that Hathcock had already received

his first kosher meal on October 17.[3]  But, on October 26, 27 and 28 the kitchen deputy told Hathcock he was not on the Ramadan list and refused to give him kosher meals.  On October 28, Hathcock filed a grievance stating that he had not received his Ramadan dinner since being transferred to North Broward Bureau jail.  The jail Ombudsman's same-day response indicated "Food Services is checking into this.  It will be corrected."  Chaplain Braswell is not involved with food preparation and indicated that any kosher meals Hathcock did not receive was due to oversight by kitchen personnel.

## C.    District Court Proceedings

Hathcock filed this § 1983 action against numerous defendants, raising many claims for relief.  Most of Hathcock's claims were dismissed pursuant to 28 U.S.C. § 1915, rulings Hathcock does not challenge in this appeal.[4]  The district court permitted Hathcock's claims regarding the Kufi cap, Jumu'ah services and Ramadan meals against defendants Sergeant Ponz and Chaplain Braswell to proceed.

The defendants moved for summary judgment based on qualified immunity.

---

[3]On October 20, Hathcock submitted a grievance form complaining that his Ramadan meals were being served cold.

[4]Hathcock filed an interlocutory appeal of the district court's order dismissing some, but not all, claims.  This Court dismissed Hathcock's appeal sua sponte for lack of jurisdiction.

The magistrate judge's report ("R&R") construed Hathcock's complaint to assert claims under both the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq., and recommended granting the defendants' motion. Over Hathcock's objections, the district court adopted the R&R and granted summary judgment to the defendants. Hathcock filed this appeal.[5]

## II. DISCUSSION

### A. RLUIPA Claims

The district court concluded that Hathcock's RLUIPA claims failed on the merits. After the district court's order, this Court concluded that RLUIPA does not create a private action for monetary damages against prison officials sued in their individual capacity. Smith v. Allen, 502 F.3d 1255, 1275 (11th Cir. 2007). Thus, Hathcock may not bring a claim for monetary damages against Ponz and

_____

[5]We review de novo a district court's grant of summary judgment, applying the same legal standards as the district court. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007). All evidence and reasonable factual inferences are viewed in a light most favorable to the non-moving party. Rojas v. Florida, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

Braswell in their individual capacities.[6]  To the extent Hathcock seeks injunctive

or declaratory relief, his RLUIPA claims are moot because he was transferred from

the custody of the BSO to the Florida Department of Corrections on May 5, 2005.

See Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir. 1988) (explaining an

inmate's § 1983 claim for injunctive or declaratory relief are moot once the inmate

has been transferred).  Accordingly, the district court did not err in granting

summary judgment to the defendants on Hathcock's RLUIPA claims.

## B.     First Amendment Claims

As to defendants' qualified immunity defense, we employ the two-step

inquiry in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001).  First, we

determine whether the defendants' conduct violated the plaintiff's constitutional

rights.  Id. at 201, 121 S. Ct. at 2156.  If no constitutional right has been violated,

our inquiry ends and the defendants are entitled to qualified immunity.  Id.  If the

facts show a constitutional violation, we determine whether the constitutional right

---

[6]Inmates may bring RLUIPA claims for nominal damages (but not compensatory or punitive damages) against defendants in their official capacities.  Smith, 502 F.3d at 1270-71, 1275-76.  However, the district court concluded that Hathcock's RLUIPA claims were against Ponz and Braswell individually.  Hathcock does not challenge this conclusion on appeal and, thus, we do not address it further.  See Sepulveda v. U.S. Att'y Gen, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (explaining that issues not raised by an appellant in the appeal brief are deemed abandoned).  Furthermore, because we conclude that Hathcock's individual capacity RLUIPA claims are not cognizable, we do not address whether the district court correctly concluded that these claims failed on the merits.

11

was clearly established at the time the violation occurred.  Id.

1.    Kufi Cap

We first conclude that the actions of Ponz and Braswell in enforcing SOP 7.14(D) and requiring Hathcock to obtain approval before wearing his Kufi cap did not violate Hathcock's First Amendment right to practice his Muslim faith. It is undisputed that (1) SOP 7.14(D) permits inmates to wear approved religious apparel in their cell, dayroom and to and from religious services; and (2) a Kufi cap would be approved apparel.  Thus, before Hathcock could wear his Kufi cap, he needed to submit the cap for inspection and obtain approval from the Chaplain's Office.

Although "prisoners do not shed all constitutional rights at the prison gate, . . . [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights."  Sandin v. Conner, 515 U.S. 472, 485, 115 S. Ct. 2293, 2301 (1995) (citation and quotation marks omitted).  A prison regulation, even though it infringes the inmate's constitutional rights to some degree, is an actionable constitutional violation only if the regulation is unreasonable.  Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000).[7]  We evaluate whether the prison

_____

[7]The Turner factors are: "(1) whether there is a 'valid, rational connection' between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates;

12

regulation is reasonable using the four factors in Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254 (1987). Id. Thus, inmates retain the right to free exercise of religion subject to prison regulation consistent with the Turner reasonableness standard. See id. at 1248.[8]

The BSO's procedures in SOP 7.14(D) are clearly reasonable. Those procedures requiring inspection and approval of apparel have a valid rational connection to a legitimate interest in ensuring that inmate apparel does not pose a threat to safety or security in the prison. Furthermore, the BSO's policy leaves open alternative means of exercising the asserted right. Indeed, BSO's policy strikes a balance generously in favor of the inmate's religious exercise given that an inmate's use of religious apparel is virtually unrestricted following approval.[9]

---

(3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an 'exaggerated response' to prison concerns." Pope v. Hightower, 101 F.3d 1382, 1384 (11th Cir. 1996) (quoting Turner, 482 U.S. at 89-91, 107 S. Ct. at 2261-62).

[8]Hathcock's appellate brief makes passing reference to the violation of his equal protection and due process rights under the United States and Florida Constitutions, but offers no substantive argument or legal analysis of these claims. Such passing references are insufficient to raise these claims on appeal. See Greenbriar, Ltd v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (finding an issue waived where only a passing reference and no substantive argument was made in the appeal brief).

[9]Notably, other circuits have upheld policies imposing more onerous restrictions and outright bans on religious headwear as reasonably related to security, disciplinary and sanitary considerations. See Young v. Lane, 922 F.2d 370, 375-77 (7th Cir. 1991); Benjamin v. Coughlin, 905 F.2d 571, 578-79 (2d Cir. 1990); Standing Deer v. Carlson, 831 F.2d 1525, 1528 (9th Cir. 1987); Rogers v. Scurr, 676 F.2d 1211, 1215-16 (8th Cir. 1982).

This inspection and approval policy is not an exaggerated response to prison concerns. Thus, under the Turner standard, SOP 7.14(D) is reasonably related to legitimate penological purposes and its enforcement by Ponz and Braswell does not violate Hathcock's constitutional rights.

2.    Jumu'ah Services

The BSO employs one full-time chaplain, Braswell, who coordinates religious services. The chaplain relies upon volunteer clergy to perform many religious services at the jail. The frequency of religious services depends upon the availability of volunteers. The BSO does not permit inmates to conduct religious services because of security concerns related to inmate supervision and affording inmates who might conduct the services "too much power."

Chaplain Braswell's reliance on volunteer clergy to conduct some religious services is reasonably related to the BSO's security and budgetary concerns. See Lawson v. Singletary, 85 F.3d 502, 510 (11th Cir. 1996); see also Overton v. Bazzetta, 539 U.S. 126, 135, 123 S. Ct. 2162, 2169 (2003) (explaining that courts are "particularly deferential" to prison administrator's regulatory judgments regarding security and allocation of financial resources). Furthermore, alternative means remained open given that Jumu'ah services were held at least twice a month and Hathcock could pray or worship in his cell on the Fridays when an Imam was

14

unavailable, speak with other Muslim inmates about his religion and arrange private meetings with outside spiritual advisors. See McCorkle v. Johnson, 881 F.2d 993, 996 (11th Cir. 1989) (explaining that the inquiry into alternative means asks "whether, under the restrictions imposed, the plaintiff is deprived of all means of practicing his religion" (quotation marks omitted)).

Hathcock argues that guards could supervise inmate-conducted religious services. However, the Turner standard "does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." Overton, 539 U.S. at 136, 123 S. Ct. at 2169. Providing additional guards to supervise inmate-conducted religious services represents more than a de minimis cost.

Given the BSO's legitimate security, budgetary and personnel concerns and the alternatives offered inmates for private practice of their faith, we conclude that it is reasonable for Chaplain Braswell to rely on volunteer Imams to conduct Jumu'ah services, even though it resulted in services being held every two weeks. Accordingly, Hathcock's First Amendment rights were not violated.

3.    Ramadan Meals

A jail should accommodate an inmate's religious dietary restrictions, subject

15

to budgetary and logistical limitations, but only when the belief is "truly held." Martinelli v. Dugger, 817 F.2d 1499, 1504-06, 1508 (11th Cir. 1987). Therefore, BSO's approval process for special religious diets corresponding to religious holidays is reasonable.

Hathcock received kosher meals for Ramadan beginning on October 17, 2004. His failure to receive a kosher meal on October 16, the first day of Ramadan, was due, at least in part, to his own failure to provide sufficient information for the Chaplain's Office to confirm the sincerity of his belief. Chaplain Braswell approved Hathcock's request for kosher meals one day after an Imam interviewed Hathcock and confirmed the sincerity of Hathcock's belief.

Although Hathcock did not receive kosher meals on October 26, 27 and 28, Hathcock has not shown that Chaplain Braswell was involved with this incident or that the meals were intentionally withheld. Rather, the record demonstrates that this occurred due to an oversight by kitchen personnel. Moreover, when Hathcock complained on October 28 that he had not received kosher meals, the ombudsman's response indicated that the error would be corrected. Given that Hathcock does not contend that he failed to receive a kosher meal on October 29, it appears the error was corrected. These facts do not demonstrate a First Amendment violation.

16

## III. CONCLUSION

For the forgoing reasons, the district court properly granted summary judgment to the defendants on Hathcock's First Amendment and RLUIPA claims.[10]

**AFFIRMED.**

---

[10]To the extent Hathcock argues that the district court erred in denying his post-judgment motion to amend his complaint (which he now characterizes as a motion to alter or amend the judgment pursuant to Rule 59(e)), we lack jurisdiction to review the district court's denial of this motion because Hancock did not amend his already-filed notice of appeal or file a second notice of appeal after the district court denied this motion. See Fed. R. App. P. 4(a)(4)(B)(ii).